(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MANHATTAN COMMUNITY ACCESS CORP. ET AL. *v.* HALLECK ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 17–1702.  Argued February 25, 2019—Decided June 17, 2019

New York state law requires cable operators to set aside channels on their cable systems for public access.  Those channels are operated by the cable operator unless the local government chooses to itself operate the channels or designates a private entity to operate the channels.  New York City (the City) has designated a private nonprofit corporation, petitioner Manhattan Neighborhood Network (MNN), to operate the public access channels on Time Warner's cable system in Manhattan.  Respondents DeeDee Halleck and Jesus Papoleto Melendez produced a film critical of MNN to be aired on MNN's public access channels.  MNN televised the film.  MNN later suspended Halleck and Melendez from all MNN services and facilities.  The producers sued, claiming that MNN violated their First Amendment free-speech rights when it restricted their access to the public access channels because of the content of their film.  The District Court dismissed the claim on the ground that MNN is not a state actor and therefore is not subject to First Amendment constraints on its editorial discretion.  Reversing in relevant part, the Second Circuit concluded that MNN is a state actor subject to First Amendment constraints.

*Held*: MNN is not a state actor subject to the First Amendment.  Pp. 5–16.

(a) The Free Speech Clause of the First Amendment prohibits only *governmental*, not *private*, abridgment of speech.  See, *e.g.*, *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 737.  This Court's state-action doctrine distinguishes the government from individuals and private entities.  Pp. 5–14.

(1) A private entity may qualify as a state actor when, as rele-

vant here, the entity exercises "powers traditionally exclusively reserved to the State." *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 352. The Court has stressed that "very few" functions fall into that category. *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149, 158. The relevant function in this case—operation of public access channels on a cable system—has not traditionally and exclusively been performed by government. Since the 1970s, a variety of private and public actors have operated public access channels. Early Manhattan public access channels were operated by private cable operators with some help from private nonprofit organizations. That practice continued until the early 1990s, when MNN began to operate the channels. Operating public access channels on a cable system is not a traditional, exclusive public function. Pp. 6–8.

(2) The producers contend that the relevant function here is more generally the operation of a public forum for speech, which, they claim, is a traditional, exclusive public function. But that analysis mistakenly ignores the threshold state-action question. Providing some kind of forum for speech is not an activity that only governmental entities have traditionally performed. Therefore, a private entity who provides a forum for speech is not transformed by that fact alone into a state actor. See *Hudgens* v. *NLRB*, 424 U. S. 507, 520–521. Pp. 8–10.

(3) The producers note that the City has designated MNN to operate the public access channels on Time Warner's cable system, and that the State heavily regulates MNN with respect to those channels. But the City's designation is analogous to a government license, a government contract, or a government-granted monopoly, none of which converts a private entity into a state actor—unless the private entity is performing a traditional, exclusive public function. See, *e.g.*, *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.*, 483 U. S. 522, 543–544. And the fact that MNN is subject to the State's extensive regulation "does not by itself convert its action into that of the State." *Jackson*, 419 U. S., at 350. Pp. 11–14.

(b) The producers alternatively contend that the public access channels are actually the City's property and that MNN is essentially managing government property on the City's behalf. But the City does not own or lease the public access channels and does not possess any formal easement or other property interest in the channels. It does not matter that a provision in the franchise agreements between the City and Time Warner allowed the City to designate a private entity to operate the public access channels on Time Warner's cable system. Nothing in the agreements suggests that the City possesses any property interest in the cable system or in the public access channels on that system. Pp. 14–15.

Syllabus

882 F. 3d 300, reversed in part and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and GORSUCH, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, BREYER, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 17–1702

———

## MANHATTAN COMMUNITY ACCESS CORPORATION, ET AL., PETITIONERS *v.* DEEDEE HALLECK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 17, 2019]

JUSTICE KAVANAUGH delivered the opinion of the Court.

The Free Speech Clause of the First Amendment constrains governmental actors and protects private actors. To draw the line between governmental and private, this Court applies what is known as the state-action doctrine. Under that doctrine, as relevant here, a private entity may be considered a state actor when it exercises a function "traditionally exclusively reserved to the State." *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 352 (1974).

This state-action case concerns the public access channels on Time Warner's cable system in Manhattan. Public access channels are available for private citizens to use. The public access channels on Time Warner's cable system in Manhattan are operated by a private nonprofit corporation known as MNN. The question here is whether MNN—even though it is a private entity—nonetheless is a state actor when it operates the public access channels. In other words, is operation of public access channels on a cable system a traditional, exclusive public function? If so, then the First Amendment would restrict MNN's exercise

of editorial discretion over the speech and speakers on the public access channels.

Under the state-action doctrine as it has been articulated and applied by our precedents, we conclude that operation of public access channels on a cable system is not a traditional, exclusive public function. Moreover, a private entity such as MNN who opens its property for speech by others is not transformed by that fact alone into a state actor. In operating the public access channels, MNN is a private actor, not a state actor, and MNN therefore is not subject to First Amendment constraints on its editorial discretion. We reverse in relevant part the judgment of the Second Circuit, and we remand the case for further proceedings consistent with this opinion.

## I
### A

Since the 1970s, public access channels have been a regular feature on cable television systems throughout the United States. In the 1970s, Federal Communications Commission regulations required certain cable operators to set aside channels on their cable systems for public access. In 1979, however, this Court ruled that the FCC lacked statutory authority to impose that mandate. See *FCC* v. *Midwest Video Corp.*, 440 U. S. 689 (1979). A few years later, Congress passed and President Reagan signed the Cable Communications Policy Act of 1984. 98 Stat. 2779. The Act authorized state and local governments to require cable operators to set aside channels on their cable systems for public access. 47 U. S. C. §531(b).

The New York State Public Service Commission regulates cable franchising in New York State and requires cable operators in the State to set aside channels on their cable systems for public access. 16 N. Y. Codes, Rules & Regs. §§895.1(f), 895.4(b) (2018). State law requires that use of the public access channels be free of charge and

first-come, first-served. §§895.4(c)(4) and (6). Under state law, the cable operator operates the public access channels unless the local government in the area chooses to itself operate the channels or designates a private entity to operate the channels. §895.4(c)(1).

Time Warner (now known as Charter) operates a cable system in Manhattan. Under state law, Time Warner must set aside some channels on its cable system for public access. New York City (the City) has designated a private nonprofit corporation named Manhattan Neighborhood Network, commonly referred to as MNN, to operate Time Warner's public access channels in Manhattan. This case involves a complaint against MNN regarding its management of the public access channels.

B

Because this case comes to us on a motion to dismiss, we accept the allegations in the complaint as true. See *Ashcroft* v. *Iqbal*, 556 U. S. 662, 678 (2009).

DeeDee Halleck and Jesus Papoleto Melendez produced public access programming in Manhattan. They made a film about MNN's alleged neglect of the East Harlem community. Halleck submitted the film to MNN for airing on MNN's public access channels, and MNN later televised the film. Afterwards, MNN fielded multiple complaints about the film's content. In response, MNN temporarily suspended Halleck from using the public access channels.

Halleck and Melendez soon became embroiled in another dispute with MNN staff. In the wake of that dispute, MNN ultimately suspended Halleck and Melendez from all MNN services and facilities.

Halleck and Melendez then sued MNN, among other parties, in Federal District Court. The two producers claimed that MNN violated their First Amendment free-speech rights when MNN restricted their access to the

public access channels because of the content of their film.

MNN moved to dismiss the producers' First Amendment claim on the ground that MNN is not a state actor and therefore is not subject to First Amendment restrictions on its editorial discretion. The District Court agreed with MNN and dismissed the producers' First Amendment claim.

The Second Circuit reversed in relevant part. 882 F. 3d 300, 308 (2018). In the majority opinion authored by Judge Newman and joined by Judge Lohier, the court stated that the public access channels in Manhattan are a public forum for purposes of the First Amendment. Reasoning that "public forums are usually operated by governments," the court concluded that MNN is a state actor subject to First Amendment constraints. *Id.*, at 306–307. Judge Lohier added a concurring opinion, explaining that MNN also qualifies as a state actor for the independent reason that "New York City delegated to MNN the traditionally public function of administering and regulating speech in the public forum of Manhattan's public access channels." *Id.,* at 309.

Judge Jacobs dissented in relevant part, opining that MNN is not a state actor. He reasoned that a private entity's operation of an open forum for speakers does not render the host entity a state actor. Judge Jacobs further stated that the operation of public access channels is not a traditional, exclusive public function.

We granted certiorari to resolve disagreement among the Courts of Appeals on the question whether private operators of public access cable channels are state actors subject to the First Amendment. 586 U. S. __ (2018). Compare 882 F. 3d 300 (case below), with *Wilcher* v. *Akron*, 498 F. 3d 516 (CA6 2007); and *Alliance for Community Media* v. *FCC*, 56 F. 3d 105 (CADC 1995).

## II

Ratified in 1791, the First Amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech." Ratified in 1868, the Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." §1. The text and original meaning of those Amendments, as well as this Court's longstanding precedents, establish that the Free Speech Clause prohibits only *governmental* abridgment of speech. The Free Speech Clause does not prohibit *private* abridgment of speech. See, *e.g., Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 737 (1996) (plurality opinion); *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 566 (1995); *Hudgens* v. *NLRB*, 424 U. S. 507, 513 (1976); cf. *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 256 (1974).

In accord with the text and structure of the Constitution, this Court's state-action doctrine distinguishes the government from individuals and private entities. See *Brentwood Academy* v. *Tennessee Secondary School Athletic Assn.*, 531 U. S. 288, 295–296 (2001). By enforcing that constitutional boundary between the governmental and the private, the state-action doctrine protects a robust sphere of individual liberty.

Here, the producers claim that MNN, a private entity, restricted their access to MNN's public access channels because of the content of the producers' film. The producers have advanced a First Amendment claim against MNN. The threshold problem with that First Amendment claim is a fundamental one: MNN is a private entity.

Relying on this Court's state-action precedents, the

producers assert that MNN is nonetheless a state actor subject to First Amendment constraints on its editorial discretion.  Under this Court's cases, a private entity can qualify as a state actor in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function, see, *e.g., Jackson*, 419 U. S., at 352–354; (ii) when the government compels the private entity to take a particular action, see, *e.g., Blum* v. *Yaretsky*, 457 U. S. 991, 1004–1005 (1982); or (iii) when the government acts jointly with the private entity, see, *e.g., Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 941–942 (1982).

The producers' primary argument here falls into the first category: The producers contend that MNN exercises a traditional, exclusive public function when it operates the public access channels on Time Warner's cable system in Manhattan.  We disagree.

A

Under the Court's cases, a private entity may qualify as a state actor when it exercises "powers traditionally exclusively reserved to the State."  *Jackson*, 419 U. S., at 352. It is not enough that the federal, state, or local government exercised the function in the past, or still does.  And it is not enough that the function serves the public good or the public interest in some way.  Rather, to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function.  See *Rendell-Baker* v. *Kohn*, 457 U. S. 830, 842 (1982); *Jackson*, 419 U. S., at 352–353; *Evans* v. *Newton*, 382 U. S. 296, 300 (1966).

The Court has stressed that "very few" functions fall into that category.  *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149, 158 (1978).  Under the Court's cases, those functions include, for example, running elections and operating a

company town. See *Terry* v. *Adams*, 345 U. S. 461, 468–470 (1953) (elections); *Marsh* v. *Alabama*, 326 U. S. 501, 505–509 (1946) (company town); *Smith* v. *Allwright*, 321 U. S. 649, 662–666 (1944) (elections); *Nixon* v. *Condon*, 286 U. S. 73, 84–89 (1932) (elections).[1]   The Court has ruled that a variety of functions do not fall into that category, including, for example: running sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity. See *American Mfrs. Mut. Ins. Co.* v. *Sullivan*, 526 U. S. 40, 55–57 (1999) (insurance payments); *National Collegiate Athletic Assn.* v. *Tarkanian*, 488 U. S. 179, 197, n. 18 (1988) (college sports); *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.*, 483 U. S. 522, 544–545 (1987) (amateur sports); *Blum*, 457 U. S., at 1011–1012 (nursing home); *Rendell-Baker*, 457 U. S., at 842 (special education); *Polk County* v. *Dodson*, 454 U. S. 312, 318–319 (1981) (public defender); *Flagg Bros.*, 436 U. S., at 157–163 (private dispute resolution); *Jackson*, 419 U. S., at 352–354 (electric service).

The relevant function in this case is operation of public access channels on a cable system. That function has not traditionally and exclusively been performed by government.

Since the 1970s, when public access channels became a regular feature on cable systems, a variety of private and public actors have operated public access channels, includ-

_____

[1] Relatedly, this Court has recognized that a private entity may, under certain circumstances, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private entity. In *West* v. *Atkins*, for example, the State was constitutionally obligated to provide medical care to prison inmates. 487 U. S. 42, 56 (1988). That scenario is not present here because the government has no such obligation to operate public access channels.

ing: private cable operators; private nonprofit organizations; municipalities; and other public and private community organizations such as churches, schools, and libraries. See *Denver Area*, 518 U. S., at 761–762 (plurality opinion); R. Oringel & S. Buske, The Access Manager's Handbook: A Guide for Managing Community Television 14–17 (1987).

The history of public access channels in Manhattan further illustrates the point. In 1971, public access channels first started operating in Manhattan. See D. Brenner, M. Price, & M. Meyerson, Cable Television and Other Nonbroadcast Video §6:29, p. 6–47 (2018). Those early Manhattan public access channels were operated in large part by private cable operators, with some help from private nonprofit organizations. See G. Gillespie, Public Access Cable Television in the United States and Canada 37–38 (1975); Janes, History and Structure of Public Access Television, 39 J. Film & Video, No. 3, pp. 15–17 (1987). Those private cable operators continued to operate the public access channels until the early 1990s, when MNN (also a private entity) began to operate the public access channels.

In short, operating public access channels on a cable system is not a traditional, exclusive public function within the meaning of this Court's cases.

B

To avoid that conclusion, the producers widen the lens and contend that the relevant function here is not simply the operation of public access channels on a cable system, but rather is more generally the operation of a public forum for speech. And according to the producers, operation of a public forum for speech is a traditional, exclusive public function.

That analysis mistakenly ignores the threshold state-action question. When the government provides a forum

for speech (known as a public forum), the government may be constrained by the First Amendment, meaning that the government ordinarily may not exclude speech or speakers from the forum on the basis of viewpoint, or sometimes even on the basis of content. See, *e.g., Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 547, 555 (1975) (private theater leased to the city); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 93, 96 (1972) (sidewalks); *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496, 515–516 (1939) (streets and parks).

By contrast, when a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor. The private entity may thus exercise editorial discretion over the speech and speakers in the forum. This Court so ruled in its 1976 decision in *Hudgens* v. *NLRB*. There, the Court held that a shopping center owner is not a state actor subject to First Amendment requirements such as the public forum doctrine. 424 U. S., at 520–521; see also *Lloyd Corp.* v. *Tanner*, 407 U. S. 551, 569–570 (1972); *Central Hardware Co.* v. *NLRB*, 407 U. S. 539, 547 (1972); *Alliance for Community Media*, 56 F. 3d, at 121–123.

The *Hudgens* decision reflects a commonsense principle: Providing some kind of forum for speech is not an activity that only governmental entities have traditionally performed. Therefore, a private entity who provides a forum for speech is not transformed by that fact alone into a state actor. After all, private property owners and private lessees often open their property for speech. Grocery stores put up community bulletin boards. Comedy clubs host open mic nights. As Judge Jacobs persuasively explained, it "is not at all a near-exclusive function of the state to provide the forums for public expression, politics, information, or entertainment." 882 F. 3d, at 311 (opinion concurring in part and dissenting in part).

In short, merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints.

If the rule were otherwise, all private property owners and private lessees who open their property for speech would be subject to First Amendment constraints and would lose the ability to exercise what they deem to be appropriate editorial discretion within that open forum. Private property owners and private lessees would face the unappetizing choice of allowing all comers or closing the platform altogether. "The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use." *Hudgens*, 424 U. S., at 519 (internal quotation marks omitted). Benjamin Franklin did not have to operate his newspaper as "a stagecoach, with seats for everyone." F. Mott, American Journalism 55 (3d ed. 1962). That principle still holds true. As the Court said in *Hudgens*, to hold that private property owners providing a forum for speech are constrained by the First Amendment would be "to create a court-made law wholly disregarding the constitutional basis on which private ownership of property rests in this country." 424 U. S., at 517 (internal quotation marks omitted). The Constitution does not disable private property owners and private lessees from exercising editorial discretion over speech and speakers on their property.[2]

The producers here are seeking in effect to circumvent this Court's case law, including *Hudgens*. But *Hudgens* is sound, and we therefore reaffirm our holding in that case.[3]

_____

[2] A distinct question not raised here is the degree to which the First Amendment *protects* private entities such as Time Warner or MNN from government legislation or regulation requiring those private entities to open their property for speech by others. Cf. *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 636–637 (1994).

[3] In *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*,

Opinion of the Court

### C

Next, the producers retort that this case differs from *Hudgens* because New York City has designated MNN to operate the public access channels on Time Warner's cable system, and because New York State heavily regulates MNN with respect to the public access channels. Under this Court's cases, however, those facts do not establish that MNN is a state actor.

New York City's designation of MNN to operate the public access channels is analogous to a government license, a government contract, or a government-granted monopoly. But as the Court has long held, the fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor—unless the private entity is performing a traditional, exclusive public function. See, *e.g., San Francisco Arts & Athletics*, 483 U. S., at 543–544 (exclusive-use rights and corporate charters); *Blum*, 457 U. S., at 1011 (licenses); *Rendell-Baker*, 457 U. S., at 840–841 (contracts); *Polk County*, 454 U. S., at 319, n. 9, and 320–322 (law licenses); *Jackson*, 419 U. S., at 351–352 (electric monopolies); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 120–121 (1973) (broadcast licenses); *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 176–177 (1972) (liquor licenses); cf. *Trustees*

―――――――

this Court said in passing dicta that "a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns." 473 U. S. 788, 801 (1985). But *Cornelius* dealt with government-owned property. As JUSTICE THOMAS explained in *Denver Area Educational Telecommunications Consortium, Inc.* v. *FCC*, the Court's admittedly imprecise and overbroad phrase in *Cornelius* is not consistent with this Court's case law and should not be read to suggest that private property owners or private lessees are subject to First Amendment constraints whenever they dedicate their private property to public use or otherwise open their property for speech. 518 U. S. 727, 827–828 (1996) (opinion concurring in judgment in part and dissenting in part).

*of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 638–639 (1819) (corporate charters). The same principle applies if the government funds or subsidizes a private entity. See *Blum*, 457 U. S., at 1011; *Rendell-Baker*, 457 U. S., at 840.

Numerous private entities in America obtain government licenses, government contracts, or government-granted monopolies. If those facts sufficed to transform a private entity into a state actor, a large swath of private entities in America would suddenly be turned into state actors and be subject to a variety of constitutional constraints on their activities. As this Court's many state-action cases amply demonstrate, that is not the law. Here, therefore, the City's designation of MNN to operate the public access channels on Time Warner's cable system does not make MNN a state actor.

So, too, New York State's extensive regulation of MNN's operation of the public access channels does not make MNN a state actor. Under the State's regulations, air time on the public access channels must be free, and programming must be aired on a first-come, first-served basis. Those regulations restrict MNN's editorial discretion and in effect require MNN to operate almost like a common carrier. But under this Court's cases, those restrictions do not render MNN a state actor.

In *Jackson* v. *Metropolitan Edison Co.*, the leading case on point, the Court stated that the "fact that a business is subject to state regulation does not by itself convert its action into that of the State." 419 U. S., at 350. In that case, the Court held that "a heavily regulated, privately owned utility, enjoying at least a partial monopoly in the providing of electrical service within its territory," was not a state actor. *Id.*, at 358. The Court explained that the "mere existence" of a "regulatory scheme"—even if "extensive and detailed"—did not render the utility a state actor. *Id.,* at 350, and n. 7. Nor did it matter whether the State had authorized the utility to provide electric service to the

community, or whether the utility was the only entity providing electric service to much of that community.

This case closely parallels *Jackson*. Like the electric utility in *Jackson*, MNN is "a heavily regulated, privately owned" entity. *Id.,* at 358. As in *Jackson*, the regulations do not transform the regulated private entity into a state actor.

Put simply, being regulated by the State does not make one a state actor. See *Sullivan*, 526 U. S., at 52; *Blum*, 457 U. S., at 1004; *Rendell-Baker*, 457 U. S., at 841–842; *Jackson*, 419 U. S., at 350; *Moose Lodge*, 407 U. S., at 176–177. As the Court's cases have explained, the "being heavily regulated makes you a state actor" theory of state action is entirely circular and would significantly endanger individual liberty and private enterprise. The theory would be especially problematic in the speech context, because it could eviscerate certain private entities' rights to exercise editorial control over speech and speakers on their properties or platforms. Not surprisingly, as JUSTICE THOMAS has pointed out, this Court has "never even hinted that regulatory control, and particularly direct regulatory control over a private entity's First Amendment speech rights," could justify subjecting the regulated private entity to the constraints of the First Amendment. *Denver Area*, 518 U. S., at 829 (opinion concurring in judgment in part and dissenting in part).

In sum, we conclude that MNN is not subject to First Amendment constraints on how it exercises its editorial discretion with respect to the public access channels. To be sure, MNN is subject to state-law constraints on its editorial discretion (assuming those state laws do not violate a federal statute or the Constitution). If MNN violates those state laws, or violates any applicable contracts, MNN could perhaps face state-law sanctions or liability of some kind. We of course take no position on any potential state-law questions. We simply conclude

that MNN, as a private actor, is not subject to First Amendment constraints on how it exercises editorial discretion over the speech and speakers on its public access channels.

## III

Perhaps recognizing the problem with their argument that MNN is a state actor under ordinary state-action principles applicable to private entities and private property, the producers alternatively contend that the public access channels are actually the property of New York City, not the property of Time Warner or MNN. On this theory, the producers say (and the dissent agrees) that MNN is in essence simply managing government property on behalf of New York City.

The short answer to that argument is that the public access channels are not the property of New York City. Nothing in the record here suggests that a government (federal, state, or city) owns or leases either the cable system or the public access channels at issue here. Both Time Warner and MNN are private entities. Time Warner is the cable operator, and it owns its cable network, which contains the public access channels. MNN operates those public access channels with its own facilities and equipment. The City does not own or lease the public access channels, and the City does not possess a formal easement or other property interest in those channels. The franchise agreements between the City and Time Warner do not say that the City has any property interest in the public access channels. On the contrary, the franchise agreements expressly place the public access channels "under the jurisdiction" of MNN. App. 22. Moreover, the producers did not allege in their complaint that the City has a property interest in the channels. And the producers have not cited any basis in state law for such a conclusion. Put simply, the City does not have "any formal

easement or other property interest in those channels." *Denver Area*, 518 U. S., at 828 (opinion of THOMAS, J.).

It does not matter that a provision in the franchise agreements between the City and Time Warner allowed the City to designate a private entity to operate the public access channels on Time Warner's cable system. Time Warner still owns the cable system. And MNN still operates the public access channels. To reiterate, nothing in the franchise agreements suggests that the City possesses any property interest in Time Warner's cable system, or in the public access channels on that system.

It is true that the City has allowed the cable operator, Time Warner, to lay cable along public rights-of-way in the City. But Time Warner's access to public rights-of-way does not alter the state-action analysis. For Time Warner, as for other cable operators, access to public rights-of-way is essential to lay cable and construct a physical cable infrastructure. See *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 628 (1994). But the same is true for utility providers, such as the electric utility in *Jackson*. Put simply, a private entity's permission from government to use public rights-of-way does not render that private entity a state actor.

Having said all that, our point here should not be read too broadly. Under the laws in certain States, including New York, a local government may decide to itself operate the public access channels on a local cable system (as many local governments in New York State and around the country already do), or could take appropriate steps to obtain a property interest in the public access channels. Depending on the circumstances, the First Amendment might then constrain the local government's operation of the public access channels. We decide only the case before us in light of the record before us.

Opinion of the Court

\*    \*    \*

It is sometimes said that the bigger the government, the smaller the individual.  Consistent with the text of the Constitution, the state-action doctrine enforces a critical boundary between the government and the individual, and thereby protects a robust sphere of individual liberty. Expanding the state-action doctrine beyond its traditional boundaries would expand governmental control while restricting individual liberty and private enterprise.  We decline to do so in this case.

MNN is a private entity that operates public access channels on a cable system.  Operating public access channels on a cable system is not a traditional, exclusive public function.  A private entity such as MNN who opens its property for speech by others is not transformed by that fact alone into a state actor.  Under the text of the Constitution and our precedents, MNN is not a state actor subject to the First Amendment.  We reverse in relevant part the judgment of the Second Circuit, and we remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

No. 17–1702

---

## MANHATTAN COMMUNITY ACCESS CORPORATION, ET AL., PETITIONERS *v.* DEEDEE HALLECK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 17, 2019]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE KAGAN join, dissenting.

The Court tells a very reasonable story about a case that is not before us. I write to address the one that is.

This is a case about an organization appointed by the government to administer a constitutional public forum. (It is not, as the Court suggests, about a private property owner that simply opened up its property to others.) New York City (the City) secured a property interest in public-access television channels when it granted a cable franchise to a cable company. State regulations require those public-access channels to be made open to the public on terms that render them a public forum. The City contracted out the administration of that forum to a private organization, petitioner Manhattan Community Access Corporation (MNN). By accepting that agency relationship, MNN stepped into the City's shoes and thus qualifies as a state actor, subject to the First Amendment like any other.

## I

### A

A cable-television franchise is, essentially, a license to create a system for distributing cable TV in a certain area. It is a valuable right, usually conferred on a private com-

pany by a local government. See 47 U. S. C. §§522(9)–(10), 541(a)(2), (b)(1); *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 628 (1994). A private company cannot enter a local cable market without one. §541(b)(1).

Cable companies transmit content through wires that stretch "between a transmission facility and the television sets of individual subscribers." *Id.*, at 627–628. Creating this network of wires is a disruptive undertaking that "entails the use of public rights-of-way and easements." *Id.*, at 628.

New York State authorizes municipalities to grant cable franchises to cable companies of a certain size only if those companies agree to set aside at least one public access channel. 16 N. Y. Codes, Rules & Regs. §§895.1(f ), 895.4(b)(1) (2016). New York then requires that those public-access channels be open to all comers on "a first-come, first-served, nondiscriminatory basis." §895.4(c)(4). Likewise, the State prohibits both cable franchisees and local governments from "exercis[ing] any editorial control" over the channels, aside from regulating obscenity and other unprotected content. §§895.4(c)(8)–(9).

### B

Years ago, New York City (no longer a party to this suit) and Time Warner Entertainment Company (never a party to this suit) entered into a cable-franchise agreement. App. 22. Time Warner received a cable franchise; the City received public-access channels. The agreement also provided that the public-access channels would be operated by an independent, nonprofit corporation chosen by the Manhattan borough president. But the City, as the practice of other New York municipalities confirms, could have instead chosen to run the channels itself. See §895.4(c)(1); Brief for Respondents 35 (citing examples).

MNN is the independent nonprofit that the borough president appointed to run the channels; indeed, MNN

appears to have been incorporated in 1991 for that precise purpose, with seven initial board members selected by the borough president (though only two thus selected today). See App. 23; Brief for Respondents 7, n. 1. The City arranged for MNN to receive startup capital from Time Warner and to be funded through franchise fees from Time Warner and other Manhattan cable franchisees. App. 23; Brief for New York County Lawyers Association (NYCLA) as *Amicus Curiae* 27; see also App. to Brief for Respondents 19a. As the borough president announced upon MNN's formation in 1991, MNN's "central charge is to administer and manage all the public access channels of the cable television systems in Manhattan." App. to Brief for NYCLA as *Amicus Curiae* 1.

As relevant here, respondents DeeDee Halleck and Jesus Papoleto Melendez sued MNN in U. S. District Court for the Southern District of New York under 42 U. S. C. §1983. They alleged that the public-access channels, "[r]equired by state regulation and [the] local franchise agreements," are "a designated public forum of unlimited character"; that the City had "delegated control of that public forum to MNN"; and that MNN had, in turn, engaged in viewpoint discrimination in violation of respondents' First Amendment rights. App. 39.

The District Court dismissed respondents' First Amendment claim against MNN. The U. S. Court of Appeals for the Second Circuit reversed that dismissal, concluding that the public-access channels "are public forums and that [MNN's] employees were sufficiently alleged to be state actors taking action barred by the First Amendment." 882 F. 3d 300, 301–302 (2018). Because the case before us arises from a motion to dismiss, respondents' factual allegations must be accepted as true. *Hernandez* v. *Mesa*, 582 U. S. \_\_\_, \_\_\_ (2017) (*per curiam*) (slip op., at 1).

## II

I would affirm the judgment below.  The channels are clearly a public forum: The City has a property interest in them, and New York regulations require that access to those channels be kept open to all.  And because the City (1) had a duty to provide that public forum once it granted a cable franchise and (2) had a duty to abide by the First Amendment once it provided that forum, those obligations did not evaporate when the City delegated the administration of that forum to a private entity.  Just as the City would have been subject to the First Amendment had it chosen to run the forum itself, MNN assumed the same responsibility when it accepted the delegation.

## A

When a person alleges a violation of the right to free speech, courts generally must consider not only what was said but also in what context it was said.

On the one hand, there are "public forums," or settings that the government has opened in some way for speech by the public (or some subset of it).  The Court's precedents subdivide this broader category into various subcategories, with the level of leeway for government regulation of speech varying accordingly.  See *Minnesota Voters Alliance* v. *Mansky*, 585 U. S. ___, ___ (2018) (slip op., at 7).  Compare *Frisby* v. *Schultz*, 487 U. S. 474, 480 (1988) (streets and public parks, traditional public forums), with *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 555 (1975) (city-leased theater, designated public forum), with *Christian Legal Soc. Chapter of Univ. of Cal., Hastings College of Law* v. *Martinez*, 561 U. S. 661, 669, 679, and n. 12 (2010) (program for registered student organizations, limited public forum).  But while many cases turn on which type of "forum" is implicated, the important point here is that viewpoint discrimination is impermissible in them all.  See *Good News Club* v. *Milford Central*

*School*, 533 U. S. 98, 106 (2001).

On the other hand, there are contexts that do not fall under the "forum" rubric. For one, there are contexts in which the government is simply engaging in its own speech and thus has freedom to select the views it prefers. See, *e.g.*, *Walker* v. *Texas Div.*, *Sons of Confederate Veterans*, *Inc.*, 576 U. S. \_\_\_, \_\_\_–\_\_\_ (2015) (slip op., at 6–7) (specialty license plates); *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467–469, 481 (2009) (privately donated permanent monuments in a public park).[1] In addition, there are purely private spaces, where the First Amendment is (as relevant here) inapplicable. The First Amendment leaves a private store owner (or homeowner), for example, free to remove a customer (or dinner guest) for expressing unwanted views. See, *e.g.*, *Lloyd Corp.* v. *Tanner*, 407 U. S. 551, 569–570 (1972). In these settings, there is no First Amendment right against viewpoint discrimination.

Here, respondents alleged viewpoint discrimination. App. 39. So a key question in this case concerns what the Manhattan public-access channels are: a public forum of some kind, in which a claim alleging viewpoint discrimination would be cognizable, or something else, such as government speech or purely private property, where picking favored viewpoints is appropriately commonplace.[2] Neither MNN nor the majority suggests that this is an in-

———————

[1] That does not mean that no restrictions apply at all to the government's expression in such spaces, but it does mean that the government can pick and choose among different views. See *Walker*, 576 U. S., at \_\_\_, \_\_\_–\_\_\_ (slip op., at 6, 17–18); *Summum*, 555 U. S., at 468.

[2] The channels are not, of course, a physical place. Under the Court's precedents, that makes no difference: Regardless of whether something "is a forum more in a metaphysical than in a spatial or geographic sense, . . . the same principles are applicable." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 830 (1995) (treating "Student Activities Fund" as the forum at issue and citing cases in which a school's mail system and a charity drive were the relevant forums).

stance of government speech.   This case thus turns first
and foremost on whether the public-access channels are or
are not purely private property.[3]

1

This Court has not defined precisely what kind of gov-
ernmental property interest (if any) is necessary for a
public forum to exist.   See *Cornelius* v. *NAACP Legal
Defense & Ed. Fund, Inc.*, 473 U. S. 788, 801 (1985) ("a
speaker must seek access to public property or to private
property dedicated to public use").   But see *ante*, at 11, n. 3
(appearing to reject the phrase "private property dedicated
to public use" as "passing dicta").   I assume for the sake of
argument in this case that public-forum analysis is inap-
propriate where the government lacks a "significant prop-
erty interest consistent with the communicative purpose of
the forum."   *Denver Area Ed. Telecommunications Consor-
tium, Inc.* v. *FCC*, 518 U. S. 727, 829 (1996) (THOMAS, J.,
concurring in judgment in part and dissenting in part).

Such an interest is present here.   As described above,
New York State required the City to obtain public-access
channels from Time Warner in exchange for awarding a
cable franchise.   See *supra*, at 2.   The exclusive right to
use these channels (and, as necessary, Time Warner's
infrastructure) qualifies as a property interest, akin at the
very least to an easement.

The last time this Court considered a case centering on
public-access channels, five Justices described an interest
like the one here as similar to an easement.   Although
JUSTICE BREYER did not conclude that a public-access
channel was indeed a public forum, he likened the cable

_____

[3] As discussed below, it is possible that some (or even many) public-
access channels are government speech.   The channels that MNN
administers, however, are clearly better thought of as a public forum
given the New York regulations mandating open and equal access.   See
*infra*, at 9–10, and n. 7.

company's agreement to reserve such channels "to the reservation of a public easement, or a dedication of land for streets and parks, as part of a municipality's approval of a subdivision of land." *Denver Area*, 518 U. S., at 760–761 (joined by Stevens and Souter, JJ.). And Justice Kennedy observed not only that an easement would be an appropriate analogy, *id.,* at 793–794 (opinion concurring in part, concurring in judgment in part, and dissenting in part, joined by GINSBURG, J.), but also that "[p]ublic access channels meet the definition of a public forum," *id.,* at 791, "even though they operate over property to which the cable operator holds title," *id.,* at 792; see also *id.,* at 792–793 (noting that the entire cable system's existence stems from the municipality's decision to grant the franchise). What those five Justices suggested in 1996 remains true today.

"A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property." *United States* v. *Craft*, 535 U. S. 274, 278 (2002). Rights to exclude and to use are two of the most crucial sticks in the bundle. See *id.,* at 283. "State law determines . . . which sticks are in a person's bundle," *id.,* at 278, and therefore defining property itself is a state-law exercise.[4] As for whether there is a sufficient property interest to trigger First Amendment forum analysis, related precedents show that there is.

As noted above, there is no disputing that Time Warner owns the wires themselves. See *Turner*, 512 U. S., at 628. If the wires were a road, it would be easy to define the public's right to walk on it as an easement. See, *e.g.*, *In re India Street*, 29 N. Y. 2d 97, 100–103, 272 N. E 2d 518,

_____

[4] The parties have not pointed this Court to any New York law definitively establishing the status of the channels. But even if there were uncertainty about the status of the channels under New York law, that would not be a reason to resolve the case against respondents (plaintiffs below) at the motion to dismiss stage. See *infra*, at 12, n. 9, 14.

518–520 (1971). Similarly, if the wires were a theater, there would be no question that a government's long-term lease to use it would be sufficient for public-forum purposes. *Southeastern Promotions*, 420 U. S., at 547, 555. But some may find this case more complicated because the wires are not a road or a theater that one can physically occupy; they are a conduit for transmitting signals that appear as television channels. In other words, the question is how to understand the right to place content on those channels using those wires.

The right to convey expressive content using someone else's physical infrastructure is not new. To give another low-tech example, imagine that one company owns a billboard and another rents space on that billboard. The renter can have a property interest in placing content on the billboard for the lease term even though it does not own the billboard itself. See, *e.g., Naegele Outdoor Advertising Co. of Minneapolis* v. *Lakeville*, 532 N. W. 2d 249, 253 (Minn. 1995); see also *Matter of XAR Corp.* v. *Di Donato*, 76 App. Div. 2d 972, 973, 429 N. Y. S. 2d 59, 60 (1980) ("Although invariably labeled 'leases,' agreements to erect advertising signs or to place signs on walls or fences are easements in gross").

The same principle should operate in this higher tech realm. Just as if the channels were a billboard, the City obtained rights for exclusive use of the channels by the public for the foreseeable future; no one is free to take the channels away, short of a contract renegotiation. Cf. *Craft*, 535 U. S., at 283. The City also obtained the right to administer, or delegate the administration of, the channels. The channels are more intangible than a billboard, but no one believes that a right must be tangible to qualify as a property interest. See, *e.g.*, *Armstrong* v. *United States*, 364 U. S. 40, 48–49 (1960) (treating destruction of valid liens as a taking); *Adams Express Co.* v. *Ohio State Auditor*, 166 U. S. 185, 219 (1897) (treating "privileges,

corporate franchises, contracts or obligations" as taxable property). And it is hardly unprecedented for a government to receive a right to transmit something over a private entity's infrastructure in exchange for conferring something of value on that private entity; examples go back at least as far as the 1800s.[5]

I do not suggest that the government always obtains a property interest in public-access channels created by franchise agreements. But the arrangement here is consistent with what the Court would treat as a governmental property interest in other contexts. New York City gave Time Warner the right to lay wires and sell cable TV. In exchange, the City received an exclusive right to send its own signal over Time Warner's infrastructure—no different than receiving a right to place ads on another's billboards. Those rights amount to a governmental property interest in the channels, and that property interest is clearly "consistent with the communicative purpose of the forum," *Denver Area*, 518 U. S., at 829 (opinion of THOMAS, J.). Indeed, it is the right to transmit the very content to which New York law grants the public open and equal access.

2

With the question of a governmental property interest resolved, it should become clear that the public-access channels are a public forum.[6] Outside of classic examples

_____

[5] For example, during the railroad boom, governments obtained not only physical easements in favor of the public over tracks used, owned, and managed by private railroads, including rights to use the rails and all relevant "fixtures and appurtenances," see, *e.g., Lake Superior & Mississippi R. Co.* v. *United States*, 93 U. S. 442, 444, 453–454 (1877), but also, in some situations, rights to transmit personnel and freight for free or at reduced rates, Ellis, Railroad Land Grant Rates, 1850–1945, 21 J. Land & P. U. Econ. 207, 209, 211–212 (1945).

[6] Though the majority disagrees on the property question, I do not take it seriously to dispute that this point would follow. See *ante*, at

like sidewalks and parks, a public forum exists only where the government has deliberately opened up the setting for speech by at least a subset of the public. *Cornelius*, 473 U. S., at 802. "Accordingly, the Court has looked to the policy and practice of the government," as well as the nature of the property itself, "to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." See *ibid.* For example, a state college might make its facilities open to student groups, or a municipality might open up an auditorium for certain public meetings. See *id.*, at 802–803.

The requisite governmental intent is manifest here. As noted above, New York State regulations require that the channels be made available to the public "on a first-come, first-served, nondiscriminatory basis." 16 N. Y. Codes, Rules & Regs. §895.4(c)(4); see also §§895.4(c)(8)–(9). The State, in other words, mandates that the doors be wide open for public expression. MNN's contract with Time Warner follows suit. App. 23. And that is essentially how MNN itself describes things. See Tr. of Oral Arg. 9 ("We do not prescreen videos. We—they come into the door. We put them on the air").[7] These regulations "evidenc[e] a clear intent to create a public forum." *Cornelius*, 473 U. S., at 802.

## B

If New York's public-access channels are a public forum, it follows that New York cannot evade the First Amendment by contracting out administration of that forum to a

—————

14–15.

[7] New York may be uncommon (as it often is); public-access channels in other States may well have different policies and practices that make them more like government speech than constitutional forums. See Brief for Respondents 30–31; Brief for American Civil Liberties Union et al. as *Amici Curiae* 13–15. New York's scheme, however, is the only one before us.

private agent. When MNN took on the responsibility of administering the forum, it stood in the City's shoes and became a state actor for purposes of 42 U. S. C. §1983.

This conclusion follows from the Court's decision in *West* v. *Atkins*, 487 U. S. 42 (1988). The Court in *West* unanimously held that a doctor hired to provide medical care to state prisoners was a state actor for purposes of §1983. *Id.*, at 54; see also *id.,* at 58 (Scalia, J., concurring in part and concurring in judgment). Each State must provide medical care to prisoners, the Court explained, *id.,* at 54, and when a State hires a private doctor to do that job, the doctor becomes a state actor, "'clothed with the authority of state law,'" *id.*, at 55. If a doctor hired by the State abuses his role, the harm is "caused, in the sense relevant for state-action inquiry," by the State's having incarcerated the prisoner and put his medical care in that doctor's hands. *Ibid.*

The fact that the doctor was a private contractor, the Court emphasized, made no difference. *Ibid.* It was "the physician's function within the state system," not his private-contractor status, that determined whether his conduct could "fairly be attributed to the State." *Id.*, at 55–56. Once the State imprisoned the plaintiff, it owed him duties under the Eighth Amendment; once the State delegated those duties to a private doctor, the doctor became a state actor. See *ibid.*; see also *id.*, at 56–57. If the rule were any different, a State would "'be free to contract out all services which it is constitutionally obligated to provide and leave its citizens with no means for vindication of those rights, whose protection has been delegated to 'private' actors, when they have been denied.'" *Id.,* at 56, n. 14.

*West* resolves this case. Although the settings are different, the legal features are the same: When a government (1) makes a choice that triggers constitutional obligations, and then (2) contracts out those constitutional

responsibilities to a private entity, that entity—in agreeing to take on the job—becomes a state actor for purposes of §1983.[8]

Not all acts of governmental delegation necessarily trigger constitutional obligations, but this one did. New York State regulations required the City to secure public-access channels if it awarded a cable franchise. 16 N. Y. Codes, Rules & Regs. §895.4(b)(1). The City did award a cable franchise. The State's regulations then required the City to make the channels it obtained available on a "first-come, first-served, nondiscriminatory basis."[9]  §895.4(c)(4).

––––––––––

[8] Governments are, of course, not constitutionally required to open prisons or public forums, but once they do either of these things, constitutional obligations attach. The rule that a government may not evade the Constitution by substituting a private administrator, meanwhile, is not a prison-specific rule. More than 50 years ago, for example, this Court made clear in *Evans* v. *Newton*, 382 U. S. 296 (1966), that the city of Macon, Georgia, could not evade the Fourteenth Amendment's Equal Protection Clause by handing off control of a park to a group "of 'private' trustees." *Id.*, at 301. Rather, "the public character of [the] park require[d] that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who ha[d] title under state law." *Id.*, at 302.

[9] Accordingly, this is not a case in which a private entity has been asked to exercise standardless discretion. See, *e.g., American Mfrs. Mut. Ins. Co.* v. *Sullivan*, 526 U. S. 40, 52 (1999). Had New York law left MNN free to choose its favorite submissions, for example, a different result might well follow.

MNN has suggested to this Court that its contract with Time Warner allows it "to curate content, to decide to put shows together on one of our channels or a different channel." Tr. of Oral Arg. 6; see Reply Brief 9. But MNN's contract cannot defeat New York law's "first-come, first-served, nondiscriminatory" scheduling requirement, 16 N. Y. Codes, Rules & Regs. §895.4(c)(4), and the discretion MNN asserts seems to be at most some limited authority to coordinate the exact placement and timing of the content it is obliged to accept indiscriminately, see Tr. of Oral Arg. 25–26. That seems akin to the authority to make reasonable time, place, and manner provisions, which is consistent with administering any public forum. See *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989). As for any factual assertions about how the channels

That made the channels a public forum. See *supra,* at 9–10. Opening a public forum, in turn, entailed First Amendment obligations.

The City could have done the job itself, but it instead delegated that job to a private entity, MNN. MNN could have said no, but it said yes. (Indeed, it appears to exist entirely to do this job.) By accepting the job, MNN accepted the City's responsibilities. See *West*, 487 U. S., at 55. The First Amendment does not fall silent simply because a government hands off the administration of its constitutional duties to a private actor.

## III

The majority acknowledges that the First Amendment could apply when a local government either (1) has a property interest in public-access channels or (2) is more directly involved in administration of those channels than the City is here. *Ante*, at 15. And it emphasizes that it "decide[s] only the case before us in light of the record before us." *Ibid.* These case-specific qualifiers sharply limit the immediate effect of the majority's decision, but that decision is still meaningfully wrong in two ways. First, the majority erroneously decides the property question against the plaintiffs as a matter of law. Second, and more fundamentally, the majority mistakes a case about the government choosing to hand off responsibility to an agent for a case about a private entity that simply enters a marketplace.

### A

The majority's explanation for why there is no govern-

_____

are operated in practice, this case arises from MNN's motion to dismiss, so the facts asserted against it must be accepted as true. *Hernandez* v. *Mesa*, 582 U. S. \_\_\_, \_\_\_ (2017) (*per curiam*) (slip op., at 1). And any uncertainty about the facts or New York law, in any event, would be a reason to vacate and remand, not reverse.

mental property interest here, *ante*, at 14–15, does not hold up.  The majority focuses on the fact that "[b]oth Time Warner and MNN are private entities"; that Time Warner "owns its cable network, which contains the public access channels"; and that "MNN operates those public access channels with its own facilities and equipment." *Ante*, at 14; see also *ante*, at 15.  Those considerations cannot resolve this case.  The issue is not who owns the cable network or that MNN uses its own property to operate the channels.  The key question, rather, is whether the channels themselves are purely private property.  An advertiser may not own a billboard, but that does not mean that its long-term lease is not a property interest. See *supra*, at 8.

The majority also says that "[n]othing in the record here suggests that a government . . . owns or leases either the cable system or the public access channels at issue here." *Ante*, at 14.  But the cable system itself is irrelevant, and, as explained above, the details of the exchange that yielded Time Warner's cable franchise suggest a governmental property interest in the channels.  See *supra,* at 6–9.

The majority observes that "the franchise agreements expressly place the public access channels 'under the jurisdiction' of MNN," *ante*, at 14, but that language simply describes the City's appointment of MNN to administer the channels.  The majority also chides respondents for failing to "alleg[e] in their complaint that the City has a property interest in the channels," *ibid.*, but, fairly read, respondents' complaint includes such an assertion.[10]  In

———————

[10] Respondents alleged that the City "created an electronic public forum" and "delegat[ed] control of that forum to" MNN. App. 17.  They further alleged that "[a]lmost all cable franchise agreements require cable operators—as a condition for easements to use the public rights-of-way—to dedicate some channels for programming by the public," *id*., at 20, invoked the state regulations requiring the designation of a channel here, *id*., at 21, and then alleged that the City's franchise

any event, any ambiguity or imprecision does not justify resolving the case against respondents at the motion-to-dismiss stage. To the extent the majority has doubts about respondents' complaint—or factual or state-law issues that may bear upon the existence of a property interest—the more prudent course would be to vacate and remand for the lower courts to consider those matters more fully. In any event, as I have explained, the best course of all would be to affirm.

B

More fundamentally, the majority's opinion erroneously fixates on a type of case that is not before us: one in which a private entity simply enters the marketplace and is then subject to government regulation. The majority swings hard at the wrong pitch.

The majority focuses on *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345 (1974), which is a paradigmatic example of a line of cases that reject §1983 liability for private actors that simply operate against a regulatory backdrop. *Jackson* emphasized that the "fact that a business is subject to state regulation does not by itself convert its action into that of the State." *Id.*, at 350; accord, *ante*, at 12. Thus, the fact that a utility company entered the marketplace did not make it a state actor, even if it was highly regulated. See *Jackson*, 419 U. S., at 358; accord,

––––––––––

agreement "requires Time Warner to set aside" the channels, *id.*, at 22. While the complaint does not use the words "property interest," those allegations can be read to include the idea that whatever was "set aside" or "dedicate[d]," *id.*, at 20, 22, qualified as a sufficient City property interest to support respondents' assertion of a public forum. Cf. *People* v. *Brooklyn & Queens Transit Corp.*, 273 N. Y. 394, 400–401, 7 N. E. 2d 833, 835 (1937) (discussing dedications of property to public use); cf. also *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U. S. 727, 794 (1996) (Kennedy, J., concurring in part, concurring in judgment in part, and dissenting in part) (noting this theory).

*ante*, at 12–13.  The same rule holds, of course, for private comedy clubs and grocery stores.  See *ante*, at 9.[11]

The *Jackson* line of cases is inapposite here.  MNN is not a private entity that simply ventured into the market-place.  It occupies its role because it was asked to do so by the City, which secured the public-access channels in exchange for giving up public rights of way, opened those channels up (as required by the State) as a public forum, and then deputized MNN to administer them.  That dis-tinguishes MNN from a private entity that simply sets up shop against a regulatory backdrop.  To say that MNN is nothing more than a private organization regulated by the government is like saying that a waiter at a restaurant is

———————

[11] There was a time when this Court's precedents may have portended the kind of First Amendment liability for purely private property owners that the majority spends so much time rejecting.  See *Marsh* v. *Alabama*, 326 U. S. 501, 505–509 (1946) (treating a company-owned town as subject to the First Amendment); *Food Employees* v. *Logan Valley Plaza, Inc.*, 391 U. S. 308, 315–320, and n. 9, 325 (1968) (extend-ing *Marsh* to cover a private shopping center to the extent that it sought to restrict speech about its businesses).  But the Court soon stanched that trend.  See *Lloyd Corp.* v. *Tanner*, 407 U. S. 551, 561–567 (1972) (cabining *Marsh* and refusing to extend *Logan Valley*); *Hudgens* v. *NLRB*, 424 U. S. 507, 518 (1976) (making clear that "the rationale of *Logan Valley* did not survive" *Lloyd*).  Ever since, this Court has been reluctant to find a "public function" when it comes to "private commer-cial transactions" (even if they occur against a legal or regulatory backdrop), see, *e.g., Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149, 161–163 (1978), instead requiring a closer connection between the private entity and a government or its agents, see, *e.g.*, *Brentwood Academy* v. *Ten-nessee Secondary School Athletic Assn.*, 531 U. S. 288, 298 (2001) (nonprofit interscholastic athletic association "pervasive[ly] entwine[d]" with governmental institutions and officials); *Lugar* v. *Edmondson Oil Co.*, 457 U. S. 922, 942 (1982) (state-created system "whereby state officials [would] attach property on the *ex parte* application of one party to a private dispute"); see also *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715, 723–725 (1961) (restaurant in municipal parking garage partly maintained by municipal agency); accord, *ante*, at 6–7.  *Jackson* exemplifies the line of cases that supplanted cases like *Logan Valley*— not cases like this one.

an independent food seller who just happens to be highly regulated by the restaurant's owners.

The majority also relies on the Court's statements that its "public function" test requires that a function have been "traditionally and exclusively performed" by the government. *Ante*, at 6 (emphasis deleted); see *Jackson*, 419 U. S., at 352. Properly understood, that rule cabins liability in cases, such as *Jackson*, in which a private actor ventures of its own accord into territory shared (or regulated) by the government (*e.g.*, by opening a power company or a shopping center). The Court made clear in *West* that the rule did not reach further, explaining that "the fact that a state employee's role parallels one in the private sector" does not preclude a finding of state action. 487 U. S., at 56, n. 15.

When the government hires an agent, in other words, the question is not whether it hired the agent to do something that can be done in the private marketplace too. If that were the key question, the doctor in *West* would not have been a state actor. Nobody thinks that orthopedics is a function "traditionally exclusively reserved to the State," *Jackson*, 419 U. S., at 352.

The majority consigns *West* to a footnote, asserting that its "scenario is not present here because the government has no [constitutional] obligation to operate public access channels." *Ante*, at 7, n. 1. The majority suggests that *West* is different because "the State was constitutionally obligated to provide medical care to prison inmates." *Ante*, at 7, n. 1. But what the majority ignores is that the State in *West* had no constitutional obligation to open the prison or incarcerate the prisoner in the first place; the obligation to provide medical care arose when it made those prior choices.

The City had a comparable constitutional obligation here—one brought about by its own choices, made against a state-law backdrop. The City, of course, had no constitu-

tional obligation to award a cable franchise or to operate public-access channels. But once the City did award a cable franchise, New York law required the City to obtain public-access channels, see *supra*, at 2, and to open them up as a public forum, see *supra*, at 9–10. That is when the City's obligation to act in accordance with the First Amendment with respect to the channels arose. That is why, when the City handed the administration of that forum off to an agent, the Constitution followed. See *supra*, at 10–13.[12]

The majority is surely correct that "when a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment." *Ante*, at 9. That is because the majority is not talking about *constitutional* forums—it is talking about spaces where private entities have simply invited others to come speak. A comedy club can decide to open its doors as wide as it wants, but it cannot appoint itself as a government agent. The difference is between providing a service of one's own accord and being asked by the government to administer a constitutional responsibility (indeed, here, existing to do so) on the government's behalf.[13]

-------

[12] *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345 (1974), by contrast, exemplifies a type of case in which a private actor provides a service that there is no governmental obligation to provide at all. See *id.*, at 353 (no state requirement for government to provide utility service); see also, *e.g., Hudgens*, 424 U. S. 507 (shopping center). In *West* v. *Atkins*, 487 U. S. 42 (1988), by contrast, the prison was obligated to provide health care in accordance with the Eighth Amendment to its prisoners once it incarcerated them, and here, the City was required to provide a public forum to its residents in accordance with the First Amendment once it granted the cable franchise. See *supra,* at 11–13.

[13] Accordingly, the majority need not fear that "all private property owners and private lessees who open their property for speech [c]ould be subject to First Amendment constraints." *Ante*, at 10. Those kinds of entities are not the government's agents; MNN is. Whether such entities face "extensive regulation" or require "government licenses, government contracts, or government-granted monopolies," *ante*, at 12,

To see more clearly the difference between the cases on which the majority fixates and the present case, leave aside the majority's private comedy club. Imagine instead that a state college runs a comedy showcase each year, renting out a local theater and, pursuant to state regulations mandating open access to certain kinds of student activities, allowing students to sign up to perform on a first-come, first-served basis. Cf. *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995). After a few years, the college decides that it is tired of running the show, so it hires a performing-arts nonprofit to do the job. The nonprofit prefers humor that makes fun of a certain political party, so it allows only student acts that share its views to participate. Does the majority believe that the nonprofit is indistinguishable, for purposes of state action, from a private comedy club opened by local entrepreneurs?

I hope not. But two dangers lurk here regardless. On the one hand, if the City's decision to outsource the channels to a private entity did render the First Amendment irrelevant, there would be substantial cause to worry about the potential abuses that could follow. Can a state university evade the First Amendment by hiring a non-profit to apportion funding to student groups? Can a city do the same by appointing a corporation to run a municipal theater? What about its parks?

On the other hand, the majority hastens to qualify its decision, see *ante*, at 7, n. 1, 15, and to cabin it to the specific facts of this case, *ante*, at 15. Those are prudent limitations. Even so, the majority's focus on *Jackson* still risks sowing confusion among the lower courts about how and when government outsourcing will render any abuses that follow beyond the reach of the Constitution.

In any event, there should be no confusion here. MNN

--------

is immaterial, so long as they have not accepted the government's request to fulfill the government's duties on its behalf.

is not a private entity that ventured into the marketplace and found itself subject to government regulation.  It was asked to do a job by the government and compensated accordingly.  If it does not want to do that job anymore, it can stop (subject, like any other entity, to its contractual obligations).  But as long as MNN continues to wield the power it was given by the government, it stands in the government's shoes and must abide by the First Amendment like any other government actor.

## IV

This is not a case about bigger governments and smaller individuals, *ante*, at 16; it is a case about principals and agents.  New York City opened up a public forum on public-access channels in which it has a property interest.  It asked MNN to run that public forum, and MNN accepted the job.  That makes MNN subject to the First Amendment, just as if the City had decided to run the public forum itself.

While the majority emphasizes that its decision is narrow and factbound, *ante*, at 15, that does not make it any less misguided.  It is crucial that the Court does not continue to ignore the reality, fully recognized by our precedents, that private actors who have been delegated constitutional responsibilities like this one should be accountable to the Constitution's demands.  I respectfully dissent.