Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/23/2024 09:11 AM CDT

Continental Resources, plaintiff and third-party
defendant, appellee, v. Kevin L. Fair, defendant
and third-party plaintiff, appellant, and
Heather Hauschild, Scotts Bluff County
Treasurer, in her official capacity, and
the County of Scotts Bluff, third-party
defendants, appellees.

___ N.W.3d ___

Filed August 23, 2024.    No. S-21-074.

1. **Summary Judgment: Appeal and Error.** An appellate court reviews
   the district court's grant of summary judgment de novo, viewing the
   record in the light most favorable to the nonmoving party and drawing
   all reasonable inferences in that party's favor.
2. \_\_\_\_: \_\_\_\_. An appellate court will affirm a lower court's grant of sum-
   mary judgment if the pleadings and admitted evidence show that there is
   no genuine issue as to any material facts or as to the ultimate inferences
   that may be drawn from those facts and that the moving party is entitled
   to judgment as a matter of law.

Appeal from the District Court for Scotts Bluff County, Leo
P. Dobrovolny, Judge. Affirmed in part, and in part reversed
and remanded for further proceedings.

Caitlin Cedfeldt, Jennifer Gaughan, Mark T. Bestul, and
Michael W. Meister, of Legal Aid of Nebraska, and Christina M.
Martin and Deborah J. La Fetra, of Pacific Legal Foundation,
pro hac vice, for appellant.

Gregory C. Scaglione, Cody B. Nickel, and Casandra
M. Langstaff, of Koley Jessen, P.C., L.L.O., for appellee
Continental Resources.

Daniel J. Zieg, Chief Deputy Lancaster County Attorney, and David Eubanks, Scotts Bluff County Attorney, for Heather Hauschild and Scotts Bluff County.

Michael T. Hilgers, Attorney General, Eric J. Hamilton, and Lincoln J. Korell for appellee State of Nebraska.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ., and Thompson, District Judge.

Per Curiam.

In an earlier opinion, we affirmed the district court's rejection of various constitutional claims Kevin L. Fair asserted concerning the issuance of a tax deed to his property. See *Continental Resources v. Fair*, 311 Neb. 184, 971 N.W.2d 313 (2022), *cert. granted and judgment vacated* ___ U.S. ___, 143 S. Ct. 2580, 216 L. Ed. 2d 1191 (2023). One of Fair's claims was that the issuance of the tax deed violated the Takings Clauses of the U.S. and Nebraska Constitutions. Fair's theory was that the issuance of the tax deed effected a taking without just compensation because it deprived him of all interest in his property, which he alleged was worth substantially more than the amount of his underlying tax debt. Fair filed a petition for certiorari in the U.S. Supreme Court, and while his petition was pending, the Court held in *Tyler v. Hennepin County*, 598 U.S. 631, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023) (*Tyler*), that a Minnesota woman who alleged that a county sold her condominium for $40,000 to satisfy a $15,000 property tax bill had alleged a plausible takings claim. The U.S. Supreme Court subsequently granted certiorari in Fair's case, vacated our judgment, and remanded the cause to this court for further consideration in light of *Tyler*. See *Fair v. Continental Resources*, ___ U.S. ___, 143 S. Ct. 2580, 216 L. Ed. 2d 1191 (2023).

Having now reconsidered our earlier opinion in light of *Tyler*, we conclude that the district court erred by granting summary judgment to Continental Resources (Continental) on

Fair's takings claim. We therefore affirm in part, and in part reverse and remand the cause for further proceedings.

## I. BACKGROUND

In our initial opinion, we set forth an overview of Nebraska's tax certificate sale process, as well as a detailed summary of the factual and procedural history of this case. We do not repeat all of that here, but instead summarize those details relevant to our opinion in this case.

### 1. Nebraska Tax Certificate Sale Process

Because tax certificate sales proceedings are governed by the law in effect at the time a tax certificate is sold, see *HBI, L.L.C. v. Barnette*, 305 Neb. 457, 941 N.W.2d 158 (2020) (superseded by statute on other grounds as stated in *Castillo v. Libert Land Holdings 4*, 316 Neb. 287, 4 N.W.3d 377 (2024)), we describe the process as it existed under statutes in effect in March 2015, when the tax certificate for the property at issue in this case was sold. We note that these statutes were substantially amended in subsequent years. See, e.g., 2023 Neb. Laws, L.B. 727; 2019 Neb. Laws, L.B. 463. The parties agree these amendments have no bearing on the issues involved in this case.

Each county in Nebraska has an automatic lien on property within its boundaries for the property taxes that are due to the government. See Neb. Rev. Stat. § 77-1901 (Cum. Supp. 2014). If taxes on the property become delinquent, statutes direct the county to offer to sell its lien via a tax certificate. See Neb. Rev. Stat. § 77-1806 (Reissue 2009). Statute sets the cost of the certificate as "the amount of taxes, interest, and cost thereon." Neb. Rev. Stat. § 77-1808 (Cum. Supp. 2014).

Once a tax certificate is sold, the original owner is not immediately divested of all rights to the property. The owner has the right to redeem the property by paying the amount listed in the tax certificate plus all other taxes paid by the tax certificate purchaser, any interest, and other fees. See Neb.

Rev. Stat. § 77-1824 (Cum. Supp. 2014). Interest on delinquent payments accrues at 14 percent per year. See Neb. Rev. Stat. § 45-104.01 (Reissue 2010).

If the property owner does not redeem the property within 3 years, the tax certificate holder can apply for a tax deed. If redemption has not occurred and the tax certificate purchaser complies with other requirements, the county treasurer is directed to provide a tax deed. See Neb. Rev. Stat. § 77-1837 (Cum. Supp. 2014). Once a tax deed is issued to the tax certificate purchaser, title to the property passes free and clear of any encumbrances. See *SID No. 424 v. Tristar Mgmt.*, 288 Neb. 425, 850 N.W.2d 745 (2014).

If a property owner fails to redeem the property, a tax certificate purchaser may, instead of demanding a tax deed, pursue another option: judicial foreclosure. See Neb. Rev. Stat. § 77-1902 (Cum. Supp. 2014). In the event of a judicial foreclosure sale, surplus proceeds are distributed "in the manner provided by law for the disposition of the surplus in the foreclosure of mortgages on real property." Neb. Rev. Stat. § 77-1916 (Cum. Supp. 2014). If a tax certificate goes unsold, the county attorney is directed to pursue judicial foreclosure. See § 77-1901.

With this background established, we turn to how this process played out in this case.

## 2. Continental Obtains Tax Deed

Fair and his wife owned real property in Scotts Bluff County, Nebraska, free of any encumbrances. The Fairs lived in a house on the property. After the Fairs failed to pay property taxes on the property, the county treasurer sold a tax certificate to Continental for the amount of the property's unpaid taxes—$588.21.

Three years later, Continental, pursuant to Nebraska statute, notified the Fairs that if they did not redeem the property by paying the total value of the unpaid taxes, fees, and interest—an amount that totaled $5,268.32—Continental would apply for a tax deed and the right of redemption would

expire. When the Fairs did not redeem the property, Continental requested a tax deed from the county treasurer. The county treasurer issued a deed to Continental. Under Nebraska law, once the tax deed was issued to Continental, title to the property passed to it free and clear of any encumbrances. See *SID No. 424, supra*.

### 3. DISTRICT COURT PROCEEDINGS

Continental thereafter filed a quiet title action against the Fairs. The Fairs responded to Continental's suit by filing an answer, counterclaim, and third-party complaint, which added the county and the county treasurer, in her official capacity, as third-party defendants. Unless more detail is required, we hereafter refer to the county and the county treasurer collectively as "the county." The Fairs also named the Attorney General of the State of Nebraska, in his official capacity, as a third-party defendant.

In their counterclaim and third-party complaint, the Fairs alleged that the issuance of the tax deed violated the Takings Clauses of the U.S. and Nebraska Constitutions, the Due Process Clauses of the U.S. and Nebraska Constitutions, the Excessive Fines Clauses of the U.S. and Nebraska Constitutions, and article I, § 25, of the Nebraska Constitution. Relevant to their takings claims, the Fairs alleged that the issuance of the tax deed to Continental was a taking without a public purpose. Alternatively, the Fairs alleged that if the issuance of the tax deed was for a public purpose, they were nonetheless entitled to just compensation. The Fairs also alleged that Continental "acted under the color of state law" and, along with the county, deprived the Fairs of constitutional rights.

Early in the proceedings, the district court dismissed the Attorney General as a party to the lawsuit. Because Fair was challenging the constitutionality of various statutes, however, the Attorney General continued to participate in the lawsuit pursuant to Neb. Rev. Stat. § 25-21,159 (Reissue 2016), a

statute that provides that the Attorney General is "entitled to be heard" if a party seeks a declaration that a statute is unconstitutional.

Continental moved for summary judgment. The summary judgment record included evidence that the total amount of the unpaid taxes, fees, and interest the Fairs owed was $5,268.32 and that, at the time the tax deed was issued, the property's assessed value was $59,759.

The district court entered summary judgment against the Fairs. It found that the Fairs' constitutional claims lacked merit.

Fair's wife died while the lawsuit was pending in the district court. Fair filed a timely appeal, and we moved the case to our docket.

## 4. This Court's Initial Opinion

On appeal, Fair assigned and argued that the district court erred by entering summary judgment against him because his constitutional claims had merit. We issued an opinion finding no such error and affirming the entry of summary judgment. With respect to Fair's takings arguments, we rejected Fair's argument that the issuance of the tax deed effected a taking for a private purpose, rather than a public purpose. We also rejected the argument that Fair was entitled to compensation for the difference between the value of his property and the value of his tax debt. On that point, we reasoned that because Nebraska law did not recognize that a former owner had a property right to value in the property over and above the tax debt, Fair could not establish a taking without just compensation. See *Continental Resources v. Fair*, 311 Neb. 184, 971 N.W.2d 313 (2022), *cert. granted and judgment vacated* ___ U.S. ___, 143 S. Ct. 2580, 216 L. Ed. 2d 1191 (2023).

After our decision was issued, Fair filed a petition for a writ of certiorari in the U.S. Supreme Court.

## 5. *Tyler v. Hennepin County*

While Fair's petition for certiorari was pending, the U.S. Supreme Court issued a decision in *Tyler v. Hennepin County*,

598 U.S. 631, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023). In that case, a woman alleged that a Minnesota county had violated the Takings Clause and Excessive Fines Clause when it seized her condominium to satisfy a $15,000 tax debt, sold the property for $40,000, and kept the excess proceeds. The federal district court dismissed the complaint for failure to state a claim, and the U.S. Court of Appeals for the Eighth Circuit affirmed. See *Tyler v. Hennepin County*, 26 F.4th 789 (8th Cir. 2022). The U.S. Supreme Court granted certiorari and then reversed, finding that the woman had alleged a plausible takings claim.

In *Tyler*, a Minnesota county argued that because Minnesota law provided that an owner forfeits his or her interest in real property after defaulting on property taxes, the woman had no property interest protected by the Takings Clause. The *Tyler* Court acknowledged that "[t]he Takings Clause does not itself define property" and that "[s]tate law is one important source" for defining property rights for purposes of the Takings Clause. 598 U.S. at 638. However, the Court added that state law "cannot be the only source" and that "'traditional property law principles,' plus historical practice and this Court's precedents" are also relevant. *Id.* Considering those sources, the Court concluded that "[t]he [c]ounty had the power to sell [the plaintiff's] home to recover the unpaid property taxes. But it could not use the toehold of the tax debt to confiscate more property than was due." *Id.*, 598 U.S. at 639.

The Court went on to set forth that English common law, which was the law in the early years of this country, the Court's precedents, and Minnesota law all recognized the existence of a protected property interest. The Court explained that the common law allowed the government to seize and sell the property of a delinquent taxpayer, but also required it to return amounts in excess of the tax debt, and that in the founding era, governments generally could sell only as much land as was necessary to satisfy a tax debt. The Court also

noted that its precedents recognized that a taxpayer is entitled to surplus funds in excess of the tax debt and that, in other contexts, Minnesota law recognizes that "a property owner is entitled to the surplus in excess of her debt." *Id.*, 598 U.S. at 645. Given its determination that under the facts alleged, the plaintiff had a property interest protected by the Takings Clause, the Court determined that she had plausibly alleged a claim for a taking without just compensation.

### 6. Initial Opinion Vacated; Cause Remanded

After issuing its decision in *Tyler*, the U.S. Supreme Court granted Fair's petition for certiorari, vacated our prior decision, and remanded the cause for further consideration in light of *Tyler*.

After remand, we directed the parties to file supplemental briefs addressing the effect of *Tyler* on this appeal. In its supplemental brief, the county argued that because the county treasurer was obligated by statute to issue the tax deed, any liability for a taking "should fall on the State as opposed to [the county]." Supplemental brief for appellee the county at 11. We subsequently invited the Attorney General to file a brief regarding the argument that the State may be liable to pay just compensation for a takings claim. After the supplemental briefs were filed, we held oral argument.

## II. ASSIGNMENTS OF ERROR

Fair assigns and argues on appeal that the district court's entry of summary judgment was erroneous because the issuance of the tax deed violated his rights (1) under the Due Process Clauses of the U.S. and Nebraska Constitutions, (2) under the Takings Clauses of the U.S. and Nebraska Constitutions, (3) under the Excessive Fines Clause of the U.S. Constitution, (4) under the 25th Amendment to the Nebraska Constitution, and (5) under article III, § 18, of the Nebraska Constitution.

## III. STANDARD OF REVIEW

[1] An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Pitts v. Genie Indus.*, 302 Neb. 88, 921 N.W.2d 597 (2019).

[2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

## IV. ANALYSIS

### 1. Takings Clause

The U.S. Supreme Court directed us to further consider our initial decision in this case in light of *Tyler*, which, as explained above, analyzed a claim under the Takings Clause. We thus begin our analysis with Fair's arguments regarding the entry of summary judgment on his takings claim.

The Fifth Amendment to the U.S. Constitution states, "[N]or shall private property be taken for public use, without just compensation." The Nebraska Constitution states, "The property of no person shall be taken or damaged for public use without just compensation therefor." Neb. Const. art. I, § 21. We have held that because Nebraska's constitutional right to just compensation includes just compensation where property has been "taken or damaged," it is broader than the corresponding federal right. See *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013). But aside from giving effect to that difference in language, we have treated the federal and state rights as "coterminous." *Id.* at 490, 827 N.W.2d at 493. Because Fair does not allege or argue that either the state or federal Takings Clause offers more protection in this case, we apply the same analysis to both claims.

(a) Fair's Private Use Argument

Turning to Fair's arguments, we find no reason to reconsider our rejection of his contention that the issuance of the tax deed effected a taking for a private purpose in violation of the Takings Clause. A party can allege a violation of either the Takings Clause's public use requirement or its just compensation requirement. A taking for a private use is unconstitutional regardless of whether just compensation is paid. See, e.g., *Montgomery v. Carter County, Tennessee*, 226 F.3d 758 (6th Cir. 2000); *Porter v. DiBlasio*, 93 F.3d 301 (7th Cir. 1996). But we found in our initial opinion that the issuance of the tax deed did not constitute a taking for a private use, and nothing in *Tyler* causes us to question that conclusion.

Instead, we find that *Tyler* provides confirmation of our conclusion that a taking for private use did not occur. In that case, the U.S. Supreme Court stated that "taxes are not themselves a taking" and that in collecting taxes, "the State may impose interest and late fees," and may "seize and sell property, including land, to recover the amount owed." *Tyler v. Hennepin County*, 598 U.S. 631, 637-38, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023). The Nebraska tax certificate statutes provide a method by which counties can recoup unpaid property taxes, and to be sure, those statutes allow for the possibility that an owner who is delinquent on his or her property taxes will end up losing his or her property to a private party. But a system in which a government seizes and sells property to recover a tax debt allows for the same possibility, and *Tyler* recognizes such an arrangement is constitutionally permissible.

Moreover, the U.S. Supreme Court held in *Kelo v. New London*, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005), that a taking meets the public use requirement if it serves a public purpose and that courts should be deferential in determining whether a public purpose is present. See, also, *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722 (7th Cir. 2020). While some on the U.S. Supreme Court have

argued that *Kelo* should be overruled, see, e.g., *Eyechaner v. City of Chicago, Illinois*, ___ U.S. ___, 141 S. Ct. 2422, 210 L. Ed. 2d 998 (2021) (Thomas, J., joined by Gorsuch, J., dissenting from denial of certiorari), the Court has not done so. Because Nebraska's tax sale certificate process serves the undoubtedly public purpose of tax collection, we see no room for us to find that Fair could establish a violation of the public use requirement in this case.

### (b) Fair's Just Compensation Argument

While *Tyler* does not call into question our rejection of Fair's argument that a private taking occurred, it does lead us to reconsider our initial analysis of Fair's claim that he is entitled to just compensation. As we have noted, we found in our initial opinion that Fair's legal theory was flawed. We reasoned that Fair could not make out a valid claim for just compensation under the Takings Clauses without identifying a protected property interest that was taken from him. We relied on U.S. Supreme Court precedent to conclude that any such property interest must be recognized by state law. And because we found that Nebraska law did not recognize that a former owner of property who lost title to his or her home through issuance of a tax deed had a right to the difference between the value of the property and his or her tax debt, we rejected Fair's claim.

### (i) Fair Had Protected Property Interest

Our reasoning in our initial opinion is plainly out of step with *Tyler*. In *Tyler*, the U.S. Supreme Court made clear that state law alone cannot and does not determine whether a claimant has a property interest that is protected by the Takings Clause. See *Tyler v. Hennepin County*, 598 U.S. 631, 638, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023) ("[o]therwise, a [s]tate could sidestep the Takings Clause by disavowing traditional property interests in assets it wishes to appropriate") (internal quotation marks omitted). In *Tyler*, the Court found that a protected property interest existed because the law

historically recognized the property interest at issue, its own precedents suggested the existence of such an interest, and Minnesota law generally protected the type of property interest at issue in other contexts.

*Tyler* is without question helpful to Fair's argument that he has identified a protected property interest in this case. At the same time, however, there are differences between the tax collection procedure employed in *Tyler* and the one employed in this case. Recall that in *Tyler*, the plaintiff's condominium was seized by the county and sold for an amount that exceeded her tax debt. Accordingly, one might conclude that the question before the Court was whether the plaintiff had a property interest in the excess proceeds from the sale. Here, however, as a result of differences in Nebraska's method of collecting delinquent property taxes, there was no leftover money after the tax debt was satisfied through a sale. Rather than the property being seized and sold with resulting excess proceeds, Continental paid an amount equal to the taxes Fair owed and later obtained title to the property free of any liens or encumbrances. As a result, if Fair has a protected property interest, it at least looks somewhat different than the property interest held by the plaintiff in *Tyler*.

But to the extent *Tyler* leaves open the question of whether Fair had a protected property interest, we conclude that one nonetheless exists. On this issue, we find significant guidance from *Hall v. Meisner*, 51 F.4th 185 (6th Cir. 2022), *cert. denied* ___ U.S. ___, 143 S. Ct. 2638, 216 L. Ed. 2d 1225 (2023) (*Hall*), an opinion of the U.S. Court of Appeals for the Sixth Circuit, which was issued months before *Tyler* and favorably cited therein.

In *Hall*, several plaintiffs brought takings claims after a Michigan county took title to their homes as a result of their failure to timely pay property taxes. Under the relevant statutory system in Michigan, if property owners failed to pay taxes by a certain point, counties could file a foreclosure petition. If, in response to the foreclosure petition, the original

owner did not redeem, a court was required to enter a foreclosure judgment that vested "'absolute title'" to the property in the county. *Id.* at 188. After the transfer of title, the city or town in which the property was located had the right to purchase the property for the amount of the tax delinquency. Pursuant to this process, the county obtained title to several properties and then sold them to a city for the amount of the tax debt; the city, in turn, sold them to a for-profit entity. The original owners brought suit against the county, the city, and the for-profit entity, alleging, among other things, a taking without just compensation.

The district court in *Hall* dismissed the takings claim. See *Hall v. Meisner*, 565 F. Supp. 3d 953 (E.D. Mich. 2021). It started from the same proposition we relied on in our initial opinion in this case—that property interests for purposes of the Takings Clause are determined by state law. From there, it found that Michigan law recognized a property interest only in any surplus proceeds after a foreclosure sale. But because the county sold the property for the amount of the tax debt, and there was thus no surplus generated, the district court found that there was no protected property interest and no plausible takings claim.

The Sixth Circuit disagreed. The Sixth Circuit found that the question of whether there was a protected property interest for purposes of the Takings Clause could not be answered solely by reference to Michigan law. If it was, the court quipped, the Takings Clause would be rendered "a dead letter." *Hall*, 51 F.4th at 190. Instead, much like the U.S. Supreme Court would several months later in *Tyler v. Hennepin County*, 598 U.S. 631, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023), the Sixth Circuit looked to "traditional property interests," "Anglo-American legal history," and whether Michigan law generally recognized the property right at issue. *Hall*, 51 F.4th at 190.

The Sixth Circuit engaged in a lengthy and detailed historical analysis of whether the plaintiffs had a protected

property interest in their properties' equity—"the property's value beyond any liens or other encumbrances upon it." *Id.* at 189. Tracing the history of equitable interests in real property beginning with the 12th century, the Sixth Circuit explained that English and early American courts gradually recognized that one who purchased land with the land pledged as security for a debt had an equitable interest in the land when the property's value exceeded the debt, even if the purchaser later failed to pay the debt. Accordingly, those courts resisted "strict foreclosure," a process whereby a borrower would "extinguish the landowner's equitable interest in the property and grant the lender full ownership of land whose value might far exceed the amount of the unpaid debt." *Id.* at 192. Instead, American courts, at least, insisted on foreclosure via a public sale whereby the debtor would be entitled to any surplus proceeds generated. Foreclosure by sale, the Sixth Circuit explained, was the means by which the debtor could be compensated for his or her "equitable title" by receiving the surplus from the sale. *Id.* at 193.

In addition to its historical analysis, the Sixth Circuit observed that Michigan law recognized equitable title in other contexts. The court also explained that the reason Michigan law recognized a right to surplus proceeds after a foreclosure sale was its recognition of the owner's interest in the property's equitable title. *Id.* at 195 ("[t]he owner's right to a surplus after a foreclosure sale . . . follows directly from her possession of equitable title before the sale. The surplus is merely the embodiment in money of the value of that equitable title").

Having determined that the plaintiffs had a protected property interest in the value of their property beyond the tax debt, the Sixth Circuit concluded that the plaintiff had alleged a plausible claim for just compensation. It explained that, based on the facts alleged, the county's foreclosure of the property was "nothing less than a strict foreclosure," since the county "took the plaintiffs' equitable titles without paying for them." *Id.* at 194.

Based on the foregoing, we are persuaded that Fair had a protected property interest to the extent the value of the property exceeded his tax debt. The Sixth Circuit demonstrated in *Hall* that property law traditionally recognized an equitable interest in the value of property beyond liens or encumbrances upon it. In addition, Nebraska law, like Michigan law, recognizes a property owner's right to equitable title in other contexts. To note just a couple of examples, outside of the tax deed process, delinquent real property taxes may be pursued through a judicial foreclosure, but there, the property is sold and surplus proceeds are returned to the original owner. See §§ 77-1901 and 77-1916. See, also, *County of Lancaster v. Trimble*, 34 Neb. 752, 52 N.W. 711 (1892) (recognizing that after tax foreclosure sale, surplus proceeds are returned to original owner). Property seized for delinquent personal property taxes must also be sold with the surplus returned to the original owner. See Neb. Rev. Stat. 77-1724 (Reissue 2018). Because "traditional property law principles" and Nebraska law generally recognize a property right, we find that Fair had a protected property interest to the extent the value of his property exceeded his tax debt. See *Tyler v. Hennepin County*, 598 U.S. 631, 638, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023) (internal quotation marks omitted).

From the foregoing conclusion, it quickly follows that if, as some evidence in the summary judgment record indicates, the value of Fair's property exceeded his tax debt, a protected property interest was taken from Fair without payment of just compensation. As in *Hall*, what happened to Fair was "nothing less than a strict foreclosure." 51 F.4th at 194. When viewed in the light most favorable to Fair, the evidence shows that he lost the equity in his property without receiving any payment for it.

### (ii) Liability to Pay Just Compensation

Our conclusion that there is evidence that would support a finding that a protected property interest was taken from

Fair does not, however, resolve this appeal. Indeed, it merely cues up the primary issue in dispute between the parties. In the post-*Tyler* briefing and argument, no party to this case seriously disputed that, under *Tyler*, Fair had a protected property interest and that it was taken from him without just compensation. Where the parties differed strenuously was over who is responsible for paying any just compensation under the Takings Clause. Fair contended that Continental and the county are jointly and severally liable; Continental contended the county is liable. The county initially suggested in its supplemental briefing that the State might be liable. Because the county suggested the State might be liable, we invited the Attorney General to weigh in. He denied that the State was liable and argued that Continental is liable, after which, at oral argument, the county seemed to switch positions and agree that Continental is liable. Because all the parties argue that someone else is responsible for any Takings Clause liability, each argues that the cause should be remanded for further proceedings against someone else.

On the issue of which party might be liable for a taking, we again find guidance from the Sixth Circuit's opinion in *Hall v. Meisner*, 51 F.4th 185 (6th Cir. 2022), *cert. denied* ___ U.S. ___, 143 S. Ct. 2638, 216 L. Ed. 2d 1225 (2023). In that case, as we have summarized, there were also multiple parties involved in various transactions associated with delinquent taxpayers' properties and named as defendants. The Sixth Circuit, however, found that only the county could be responsible to pay just compensation. Quoting language from *Knick v. Township of Scott*, 588 U.S. 180, 139 S. Ct. 2162, 204 L. Ed. 2d 558 (2019), the Sixth Circuit stated, "[T]he act of taking is the event which gives rise to the claim for compensation." *Hall*, 51 F.4th at 196 (internal quotation marks omitted). The Sixth Circuit determined that the act of taking was the county's taking of absolute title through its request of foreclosure because, before that, "the plaintiffs held equitable title [and,] after it, they held no title at all." *Id.*

Applying the reasoning of *Hall* to this case, we find that the party that is potentially liable to pay just compensation for a taking is Continental. Under the facts alleged in *Hall*, the county was found to have taken the properties because it pursued the strict foreclosure option under Michigan statute that resulted in the loss of the former owners' equitable title. Here, it was Continental that pursued the strict foreclosure option that, viewing the evidence in the light most favorable to Fair, resulted in Fair's loss of equitable title. Before Continental requested a tax deed, Fair had equitable title to his property, but after Continental obtained the tax deed, if it properly recorded it, Fair will have no title at all. If Continental had not requested the tax deed, Fair would not have lost his equitable title.

We recognize that in addition to the similarity between the county in *Hall* and Continental in this case, there is a major difference insofar as Continental is a private corporation rather than a governmental entity. This is significant because to obtain relief for a violation of the Takings Clause, the plaintiff must show that state action deprived him or her of a protected property interest. See, e.g., *Story v. Green*, 978 F.2d 60 (2d Cir. 1992). Under these circumstances, however, we find that Continental's pursuit of the tax deed qualifies as state action.

As the U.S. Supreme Court recently recognized, "a private entity can qualify as a state actor in a few limited circumstances." *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802, 809, 139 S. Ct. 1921, 204 L. Ed. 2d 405 (2019). Fair argues that two of those recognized circumstances are present here. He argues that Continental is a state actor because it performed a public function and because it acted jointly with governmental entities.

Fair makes a plausible argument that Continental is a state actor because it performed a public function. The U.S. Supreme Court has held that a private entity may qualify as a state actor when it exercises "powers traditionally exclusively reserved

to the State." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S. Ct 449, 42 L. Ed. 2d 477 (1974). And while the Court has found that "very few" functions meet this test, *Manhattan Community Access Corp.*, 587 U.S. at 809 (internal quotation marks omitted), it has suggested that both "tax collection," *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 163, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978), and powers "traditionally associated with sovereignty, such as eminent domain," might qualify. *Jackson*, 419 U.S. at 353. Furthermore, in *Tyler*, the Court indicated that it is the government that has the power to seize property to satisfy tax debts. 598 U.S. at 638 (government "may also seize and sell property, including land, to recover the amount owed"). In this case, Nebraska's statutory system gives tax certificate purchasers like Continental a power that would seem to be "traditionally associated with sovereignty": the power to seize property from owners for their failure to pay taxes to the sovereign.

We find that we need not determine whether Continental is a state actor under the public function test, because we find that it qualifies as a state actor on the basis of its joint action with governmental entities. In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982), the U.S. Supreme Court found that a private creditor engaged in state action when it utilized an ex parte prejudgment attachment procedure authorized by state statute, which resulted in state officials sequestering the goods of a debtor. The Court explained that its cases treated a party as a state actor when a deprivation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible" and when the party charged with the deprivation "may fairly be said to be a state actor." *Id.*, 457 U.S. at 937. The first requirement was clearly met because the statute allowed the creditor to seek prejudgment attachment. The Court found that the second requirement was also met because state officials aided the creditor in the use of the state-created attachment procedures.

Although some language in *Lugar* could be read to limit its holding to due process challenges to prejudgment attachment procedures, there are obvious parallels to Continental in this case. Much like the private party in *Lugar*, Continental, by obtaining a tax deed, exercised a privilege created by the State in order to seize property. Also, like the private party in *Lugar*, Continental required the assistance of governmental parties in order to complete its action. Without the county's sale of the tax certificate and issuance of the tax deed, Continental would not have obtained the property.

The U.S. Supreme Court would later cite *Lugar* for the proposition that "when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." *Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 486, 108 S. Ct. 1340, 99 L. Ed. 2d 565 (1988). A tax certificate purchaser who requests and obtains a tax deed would appear to meet that test. And, in fact, the U.S. Court of Appeals for the Fourth Circuit has concluded as much, finding in *Plemons v. Gale*, 396 F.3d 569 (4th Cir. 2005), that a tax lien purchaser under a West Virginia statutory procedure was a state actor. The court observed that the State is the initial seller of the tax lien and ultimately "extinguishes the owner's rights to the property by issuing the tax deed to the property." *Id.* at 573 n.3. West Virginia's highest court has also determined that a tax certificate purchaser under its statutes engages in state action. See *Wells Fargo Bank, N.A. v. UP Ventures II*, 223 W. Va. 407, 675 S.E.2d 883 (2009). For largely the same reasons, we find that Continental can be fairly characterized as a state actor when it obtained a tax deed to the property.

While we find that Continental engaged in state action as a result of its use of state procedures and state assistance, this conclusion is reinforced by the overall character of Nebraska's delinquent property tax collection system and the relationship between governmental parties and tax certificate purchasers it creates. Through the sale of tax certificates, the

State and its political subdivisions continue to receive revenue even if property owners fail to pay their taxes as they become due. The State incentivizes those private investors to purchase the certificates by offering what can only be characterized as a very generous interest rate on the purchase. See § 45-104.01. See, also, *Leigh v. Green*, 64 Neb. 533, 545, 90 N.W. 255, 259 (1902) (suggesting Nebraska's tax collection system holds out "great inducements" to tax lien purchasers).

But the continued revenue is not the only benefit the State and its political subdivisions receive through the system; they also avoid the time and expense associated with foreclosing on delinquent properties. The State and its political subdivisions avoid the expense of foreclosure proceedings, because the statutes that create the tax collection system delegate to the private investors the common governmental function of seizing properties to satisfy a tax debt. This too comes with an incentive for the private investor. Under the system, if the private investor requests a tax deed, it can obtain title to the property free and clear of any liens or encumbrances, and it is not required to compensate the original owner for the lost equity. In some cases, this can lead to the investor obtaining what one member of this court once described as a "windfall that borders on the obscene," *Wisner v. Vandelay Investments*, 300 Neb. 825, 869, 916 N.W.2d 698, 730 (2018) (Cassel, J., dissenting in part) (superseded by statute on other grounds as stated in *Castillo v. Libert Land Holdings 4*, 316 Neb. 287, 4 N.W.3d 377 (2024)), something few profit-maximizing investors would pass up.

We find all this relevant to the state action inquiry because U.S. Supreme Court cases have recognized that the relationship between governmental and private actors can be the basis for a finding that an otherwise private party engaged in state action. The U.S. Supreme Court has articulated different formulations of what must be present for a relationship between a governmental and private party to amount to state action. See, e.g., *Brentwood Academy v. Tennessee Secondary School*

*Athletic Assn.*, 531 U.S. 288, 302, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) (finding state action based on "entwinement" between private and governmental actors); *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) (action of private party can be state action if state provided "significant encouragement, either overt or covert"); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 175, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972) (describing finding of state action in prior case as based on "symbiotic relationship" between government and private actors). Whether these are separate tests or merely different ways of asking whether "there is a sufficiently close nexus between the State and the challenged action of the [private party] so that the action of the latter may be fairly treated as that of the State itself," *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974), we find that such a nexus is present here. See, also, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982). Delinquent property tax collection occurs in Nebraska through an interdependent, mutually beneficial relationship between the State and its political subdivisions and tax certificate purchasers in which the State delegates to the tax certificate purchaser the job of collecting tax debts of delinquent taxpayers and offers a powerful incentive to the investor to request the issuance of a tax deed if the value of the property exceeds the tax debt. Given this relationship, in our "normative judgment," a tax certificate purchaser's decision to obtain a tax debt is "fairly attributable" to the State and thus qualifies as state action. *Brentwood Academy*, 531 U.S. at 295.

In addition to arguing that it cannot be held liable as a state actor, Continental resists the notion that it could be liable to pay Fair just compensation by arguing that the only action it took in this case was to purchase the property from the county. According to Continental, by acquiring the tax certificate, it entered into something akin to a real estate purchase agreement with the county, whereby Continental acquired full

rights to the property if Fair failed to redeem. In Continental's view, the county took Fair's interest and Continental merely purchased it via the sale of the tax certificate.

Continental's argument appears to rest on the following premise: A party is not liable to pay just compensation for a taking merely because another party that has already taken the property sells it to the first party at a price far below its market value. This premise finds support in *Hall v. Meisner*, 51 F.4th 185 (6th Cir. 2022), *cert. denied* ___ U.S. ___, 143 S. Ct. 2638, 216 L. Ed. 2d 1225 (2023). The Sixth Circuit found that the city in that case was not responsible to pay just compensation, even though it acquired the property for far less than its value. Even if this premise is correct, however, it does not assist Continental.

Unlike the city in *Hall*, Continental did not purchase a property the county had already taken. The county did not have authority to take Fair's property when it sold the tax certificate. When Fair failed to pay his property taxes as they became due, all the county had was a lien on the property in the amount of the tax debt. See § 77-1901. Unlike the county in *Hall*, the county here lacked the power to take "absolute title" to the property. The county sold its lien to Continental via the tax certificate, but, as we explained in our initial opinion in this case, the sale of the certificate alone is far from a conveyance of absolute title. Even if a tax certificate is sold, the "purchaser has no immediate right to enter the property, use the property, or dispossess the owner of the property," and, further, if the property is redeemed or the tax certificate holder fails to act by the statutory deadline, it "never obtains the right to do those things." *Continental Resources v. Fair*, 311 Neb. 184, 194, 971 N.W.2d 313, 321 (2022), *cert. granted and judgment vacated* ___ U.S. ___, 143 S. Ct. 2580, 216 L. Ed. 2d 1191 (2023). Based on these considerations, we determined in our initial opinion that "a property owner is not deprived of his or her property at the time the tax certificate is issued," and thus Fair's due process rights were not

violated when he did not receive notice that the tax certificate was sold. *Id.* Nothing in *Tyler v. Hennepin County*, 598 U.S. 631, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023), causes us to reconsider our determination that Fair was not deprived of his property at the time the tax certificate was sold.

Rather than purchasing the property through the tax certificate, Continental purchased the county's lien. Because it owned the lien, Continental, like the county, could pursue judicial foreclosure if Fair failed to redeem. See § 77-1902. But, as a result of the state statutes pertaining to tax deeds, Continental also obtained something the county never had—the right to obtain a tax deed and, with it, Fair's equitable interest in the property. Because Continental elected this option and obtained title to the property, we find that it took Fair's property and could be liable to pay just compensation.

Like Continental, Fair argues that the county should be liable to pay just compensation, but for different reasons. Fair does not agree with Continental that the county took the property at or just prior to the sale of the tax certificate. He instead takes the position that a taking occurred, at the earliest, when the tax deed was issued. And while Fair agrees with the county that it was Continental's election to request a tax deed that resulted in the loss of his equitable title and that Continental is thus liable, he argues that the county is also liable. He argues that the county is liable because its issuance of the tax deed was also essential to the loss of his protected property interest.

The county, however, never obtained title to Fair's property, and the county treasurer was obligated by statute to issue a deed to Continental. We are unable to find support for the proposition that a party is liable to pay just compensation for a taking when it does not take property for itself but instead is statutorily obligated to perform a ministerial function that results in the taking of property by another.

To the contrary, a case from this court recognizes that not every government actor that plays some role in a taking is

liable to pay just compensation. In *Strom v. City of Oakland*, 255 Neb. 210, 583 N.W.2d 311 (1998), a city complained to a natural resources district that sediment from an adjoining landowner had damaged the city's property. The natural resources district thereafter sought and received a court order requiring the adjoining landowner to take certain measures. The landowner later filed an action contending that the city and the natural resources district had effected a taking without just compensation. After the district court entered summary judgment for the natural resources district and the city and the landowner appealed, we reversed as to the natural resources district and dismissed the appeal as to the city. We found that genuine issues of material fact precluded summary judgment for the natural resources district but that the city could not be liable because, although it initiated an action with the natural resources district, it had not sought the court order that was the basis of the takings claim. Similarly, in this case, the county may have performed a ministerial action that led to the loss of Fair's property, but we find that was insufficient to incur the obligation to pay just compensation.

In addition to the foregoing, we note that our determination that Continental is potentially liable to pay just compensation (and the county is not) is consistent with principles of restitution. In some circumstances, the law of restitution requires a defendant to disgorge a benefit that he or she has unjustifiably obtained at the plaintiff's expense. See, e.g., *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011). In this case, any windfall that was obtained as a result of Nebraska's tax certificate sale process was obtained by Continental, and not the county.

### (iii) Summary

In summary, we find that, viewing the evidence in the light most favorable to Fair, there are genuine issues of material fact that preclude summary judgment in favor of Continental on Fair's claim for just compensation. Applying the same

standard to the county and county treasurer, we find no such genuine issues of material fact and conclude the county is entitled to summary judgment on Fair's claim for just compensation. Although the parties' briefing at times discussed the possibility that the State might be liable to pay just compensation, we express no opinion on that question. The Attorney General was initially named as a defendant in this case but was dismissed (with Fair's agreement) prior to summary judgment, and Fair neither assigns error to the Attorney General's dismissal nor contends that the State is liable to pay just compensation.

## 2. Excessive Fines

Although Fair's post-*Tyler* argument focuses primarily on his claim for just compensation under the Takings Clause, he also makes a brief argument regarding his claim under the Eighth Amendment's Excessive Fines Clause. On this point, Fair relies on a concurring opinion of two justices in *Tyler*. See *Tyler v. Hennepin County,* 598 U.S. 631, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023) (Gorsuch, J., concurring; Jackson, J., joins).

In *Tyler*, the majority declined to reach the plaintiff's argument that the district court erred by dismissing her claim under the Excessive Fines Clause. The plaintiff in that case had acknowledged that relief under the Takings Clause would "'fully remedy [her] harm.'" *Id.*, 598 U.S. at 647. Given that acknowledgment and its determination that the plaintiff had plausibly alleged a claim under the Takings Clause, the Court found that it was not necessary to analyze the Excessive Fines Clause claim.

Fair makes a similar concession here. In his supplemental brief, he acknowledges that just compensation under the Takings Clause would provide complete relief and that thus, if we recognize a viable claim under the Takings Clause, we "might similarly decline to decide the excessive fines questions." Supplemental brief for appellant at 28. Because we

have found that Fair has a viable claim under the Takings Clause, we decline to reconsider our initial opinion's analysis of Fair's Excessive Fines Clause claim.

### 3. Other Assignments of Error

We find nothing in *Tyler* that causes us to reconsider our initial opinion's rejection of Fair's other assignments of error. Accordingly, we find no merit to those assignments of error.

## V. CONCLUSION

We find that viewing the evidence in the light most favorable to Fair, as our standard of review requires, Continental was not entitled to judgment as a matter of law on Fair's claim for just compensation under the Takings Clause. We therefore reverse the district court's entry of summary judgment to Continental on that claim and remand the cause for further proceedings. Applying the same standard of review to all of the other claims, we find that there is no genuine issue of material fact and that Continental and the county are entitled to judgment as a matter of law. We therefore affirm the district court's entry of summary judgment in all other respects.

Affirmed in part, and in part reversed and
remanded for further proceedings.

Miller-Lerman, J., not participating.

Papik, J., concurring in part, and in part dissenting.

I agree with the court's conclusion that, in light of the U.S. Supreme Court's opinion in *Tyler v. Hennepin County*, 598 U.S. 631, 143 S. Ct. 1369, 215 L. Ed. 2d 564 (2023), Fair had a protected property interest and therefore has a viable claim for just compensation under the Takings Clauses of the U.S. and Nebraska Constitutions. But, as the majority opinion observes, resolution of that question prompts another: Who is liable to pay just compensation?

In my view, this followup question is a difficult one; while *Tyler* provides guidance on whether Fair has a viable claim for just compensation, it does not offer much direct assistance

as to who might be liable to pay just compensation here. Perhaps unsurprisingly, there appears to be little other authority directly addressing who is responsible to pay just compensation in circumstances like the ones presented in this case. Faced with this difficult question, the majority determines that Continental Resources (Continental) is the party that is liable to pay just compensation. I respectfully disagree. My view is that Scotts Bluff County would be liable to pay just compensation and that Continental would not. I explain my thinking below.

*Liability of Scotts Bluff County.*

The U.S. Supreme Court has instructed that "the act of taking is the event which gives rise to the claim for compensation." *Knick v. Township of Scott*, 588 U.S. 180, 190, 139 S. Ct. 2162, 204 L. Ed. 2d 558 (2019) (internal quotation marks omitted). To determine who is liable to pay just compensation, we must thus determine who took a protected property interest from Fair. That property interest, as the majority opinion explains, is his equitable interest in his property, i.e., the property's value beyond the tax debt.

To determine who took Fair's property interest, it seems worthwhile to consider, step by step, what happened to Fair's interest under Nebraska's tax certificate statutes. As the majority opinion details, the county held a lien on Fair's property to the extent of his tax debt. By selling a tax certificate to Continental for the amount of the tax debt, the county sold that lien to Continental. But, as a consequence of Nebraska's tax certificate statutes, the sale of the tax certificate also resulted in Continental's acquisition of something else—the right, if Fair failed to redeem the property, to request a tax deed and thereby obtain the entire property free and clear of any liens or encumbrances. See *SID No. 424 v. Tristar Mgmt.*, 288 Neb. 425, 850 N.W.2d 745 (2014). When Fair ultimately failed to redeem the property in this case and Continental requested a tax deed, the county treasurer, in the words of

the relevant statute, delivered a "deed of conveyance" for the property to Continental. See Neb. Rev. Stat. § 77-1837 (Reissue 2018).

In my judgment, the foregoing amounts to a taking of Fair's equitable interest on the part of the county. As a result of the tax certificate statutes, the county sold to Continental, for the amount of the tax debt, a conditional right to obtain absolute title to Fair's property should he fail to redeem. Then, when the condition arose and Continental exercised the right it obtained as a result of acquiring the tax certificate from the county, the county "conveyed" the property to Continental. In order to convey the property to Continental, the county had to first assume Fair's rights thereto. As this court and many others have recognized, "one cannot convey to another a greater interest in real estate than he himself possesses." *Gregory v. Pribbeno*, 143 Neb. 379, 383, 9 N.W.2d 485, 488 (1943). See 22B Am. Jur. 2d *Deeds* § 7 (2024) (collecting cases).

In *Tyler*, the Court said the county in that case "could not use the toehold of [a] tax debt to confiscate more property than was due." 598 U.S. at 639. I grant there are obvious differences between the actions of the county in *Tyler* and the actions of the county in this case. Even so, I understand the county in this case to have used the toehold of a tax debt to confiscate the entirety of Fair's interests in his property. In this case, the county just took the additional step of transferring the property in excess of the tax debt to someone else.

I recognize that the county did not come away from these events with a windfall and that its actions appear to have been compelled by state law. I do not understand either of these factors, however, to have any bearing on the county's liability to pay just compensation. First, I see no basis to conclude that the county cannot be held liable because it did not ultimately profit from the extinguishment of Fair's interest in his property. The Sixth Circuit's opinion in *Hall v. Meisner*, 51 F.4th 185 (6th Cir. 2022), *cert. denied* ___ U.S. ___, 143 S. Ct. 2638, 216 L. Ed. 2d 1225 (2023), illustrates the point. In

*Hall*, the county did not profit from taking absolute title to the properties of the original owners because it was obligated to sell the property to the city where the properties were located for the amount of the tax debt. Even so, because the county took absolute title from the original owner, it was liable to pay just compensation. And second, while the county here also argues that it cannot be held liable because it was obligated by state law to do everything it did, it offers no authority indicating that a political subdivision escapes liability to pay just compensation for a taking compelled by state law. Indeed, it would seem that a taking compelled by state law is no different than any other unfunded mandate: the political subdivision may have a moral or political argument that the State should pay for the liability it forced its political subdivision to incur but no argument that the political subdivision is not legally responsible for that liability.

For these reasons, I do not believe the county was entitled to summary judgment and would remand the cause for further proceedings on Fair's claim for just compensation against it.

*Liability of Continental.*

The majority finds that Continental would be liable to pay just compensation for any taking of Fair's property interest. It is not clear to me that Continental's actions of purchasing a tax certificate and then obtaining a tax deed amount to a taking of Fair's property. Continental came away with a windfall, to be sure, but, for the reasons discussed above, it appears to have received property that the county had already taken from Fair. Ultimately, however, I believe there is another reason that precludes pinning liability to pay just compensation on Continental—I do not believe it engaged in state action.

There appears to be no dispute in this case that Continental could be held liable to pay just compensation only if it engaged in state action. See, e.g., *Story v. Green*, 978 F.2d 60 (2d Cir. 1992). Neither is there any dispute that, outside of "a few limited circumstances," private corporations like Continental are not state actors. See, e.g., *Manhattan Community Access*

*Corp. v. Halleck*, 587 U.S. 802, 809, 139 S. Ct. 1921, 204 L. Ed. 2d 405 (2019). While Fair argues that two of those circumstances are present here, I am unpersuaded.

Fair first argues that Continental is a state actor because it performed a public function. The U.S. Supreme Court has held that an otherwise private entity may qualify as a state actor when it exercises "powers traditionally exclusively reserved to the State." *Id.* (internal quotation marks omitted). "It is not enough," however, that "the federal, state, or local government exercised the function in the past, or still does." *Id.* "Rather, to qualify as a traditional, exclusive public function" within the meaning of the Court's cases, "the government must have traditionally *and* exclusively performed the function." *Id.* (emphasis in original). The Court has emphasized that "very few" functions meet this test. *Id.* (internal quotation marks omitted).

Fair argues that, in this case, governmental entities delegated their function of collecting property tax debts to Continental and that therefore, Continental meets the public function test. Fair, however, does not point to any historical evidence that tax collection generally, let alone property tax collection, was traditionally the *exclusive* job of the government. And, in any case, there is evidence to the contrary right here in Nebraska. As we recently observed in our initial opinion in this case, "[t]he tax sale process has been a part of Nebraska law since at least 1879." *Continental Resources v. Fair*, 311 Neb. 184, 185, 971 N.W.2d 313, 316 (2022), *cert. granted and judgment vacated* ___ U.S. ___, 143 S. Ct. 2580, 216 L. Ed. 2d 1191 (2023). Going back even further in time, this court observed over a century ago that "[s]elling the tax and authorizing the purchaser to collect it is a method of collection almost as old as taxation itself." *Leigh v. Green*, 64 Neb. 533, 545, 90 N.W. 255, 259 (1902). Given the historical prevalence of the method of tax collection at issue, I see no room for a finding that Continental exercised a function that the government traditionally and exclusively performed.

Alternatively, Fair argues that Continental qualifies as a state actor because it jointly participated in the taking of the property. On this point, Fair relies on the U.S. Supreme Court's opinion in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982). In that case, a private creditor was found to have engaged in state action when it utilized a statutory prejudgment attachment procedure whereby, after an ex parte hearing, a court clerk issued a writ that authorized state officials to sequester a debtor's property. See *id.* The U.S. Supreme Court explained that it had recognized that "a private party's joint participation with state officials in the seizure of disputed property" is sufficient to characterize the otherwise private party as a state actor. *Id.*, 457 U.S. at 941. Fair argues that Continental engaged in similar action here.

Although Continental's actions may bear some similarities to the creditor in *Lugar*, the Court's holding in that case was narrow. On several occasions in its opinion, the Court emphasized that its determination that there was state action was limited to due process challenges to prejudgment attachment procedures. See, e.g., *id.*, 457 U.S. at 939 n.21 (stating that holding was "limited to the particular context of prejudgment attachment"). Many other courts have recognized that the rule adopted in *Lugar* is limited to prejudgment attachment procedures and refused to expand it beyond those limits. See, e.g., *Cobb v. Georgia Power Co.*, 757 F.2d 1248 (11th Cir. 1985); *Mitchell v. Bank of New York Mellon*, 835 Fed. Appx. 318 (10th Cir. 2020); *Hill v. Langer*, 86 Fed. Appx. 163 (6th Cir. 2004). On top of that, the U.S. Supreme Court itself has emphasized that the language of *Lugar* "must not be torn from the context out of which it arose." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 58, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999).

Whatever similarities there might be between the creditor in *Lugar* and Continental, this case does not involve a challenge to a prejudgment attachment procedure. I do not believe *Lugar* supports the argument that Continental engaged in state action.

In addition to Fair's arguments for why Continental engaged in state action, the majority suggests that Continental engaged in state action for another reason: the existence of a nexus between the State and Continental under Nebraska's property tax collection system. The U.S. Supreme Court has recognized that an otherwise private party engages in state action if "there is a sufficiently close nexus between the State and the challenged action of the [private party] so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974). Respectfully, I am not convinced Continental qualifies as a state actor under the nexus test.

I acknowledge that, under the relevant statutes, tax certificate purchasers play a role in the State's collection of tax debt and that this system is mutually beneficial to both tax certificate purchasers and the State's political subdivisions. But, to determine whether a private party qualifies as a state actor under the nexus test, the question that must be asked is whether the "*challenged action*" of the private party can be "fairly treated as that of the State itself." *Id.* (emphasis supplied). In this case, the action of Continental that Fair challenges is its request for the issuance of a tax deed. But no state official or policy had anything to do with Continental's decision to request a tax deed. It was instead a decision of a private investor, presumably based on profit maximization. See *Blum v. Yaretsky*, 457 U.S. 991, 1008, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) (finding no state action when challenged conduct involved "medical judgments made by private parties according to professional standards that are not established by the State"). Furthermore, by the time a tax certificate purchaser like Continental decides whether to request a tax deed for or pursue judicial foreclosure of a delinquent property, governmental entities do not even have a financial interest in its choice. By that time, the county has already received the revenue it would have received from the taxpayer.

No one could dispute that the State created the remedy that allows tax certificate purchasers like Continental to obtain absolute title if the original owner fails to redeem. And I do not question the majority's suggestion that this remedy is an incentive provided by the State to encourage the purchase of tax certificates. The U.S. Supreme Court has consistently maintained, however, that a private party's mere use of a state-created remedy does not alone amount to state action. See, *American Mfrs. Mut. Ins. Co.*, 526 U.S. at 53 ("[w]e have never held that the mere availability of a remedy for wrongful conduct, even when the private use of that remedy serves important public interests, so significantly encourages the private activity as to make the State responsible for it"); *Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 485, 108 S. Ct. 1340, 99 L. Ed. 2d 565 (1988) ("[p]rivate use of state-sanctioned private remedies or procedures does not rise to the level of state action"). Because all I understand Continental to have done is make use of a state-created remedy, I do not see a basis to find state action under the nexus test.

Because I perceive no way to conclude that Continental engaged in state action, I do not believe it can be liable to pay just compensation for a taking.

*Conclusion.*

The majority opinion observes that its resolution is consistent with principles of restitution. I do not dispute that the majority's resolution is consistent with certain equitable notions. The court requires Continental—the one party that acted with discretion and reaped a windfall—to give up a portion of what it gained through the purchase of the tax certificate. At the same time, it absolves the county—the party that merely followed state law and obtained no windfall.

That said, I am not convinced that this is a case in which equitable notions are seamlessly aligned with the constitutional analysis. As I have discussed, viewing the evidence

in the light most favorable to Fair, I understand the county, undoubtedly a state actor, to have taken Fair's property. Applying the same standard to Continental, I do not see a basis to conclude that it engaged in state action. Accordingly, I believe the county, rather than Continental, faces liability to pay just compensation. I respectfully dissent to the extent the majority's decision holds otherwise.